JOHN G. HORNER, receiver, &c., complainant and appellant,

v.

GEORGE W. HEINECKE et al., defendants and respondents.

[Argued March 10th, 1916.    Decided June 19th, 1916.]

1. A beneficial society acquired no title to excess dues paid by the members thereof pursuant to an order of the court of chancery providing in effect that they be deemed involuntary payments to be returned if determined by the court to have been unlawfully exacted, it appearing that the court had so determined. Such excess fund will be deemed to be a trust fund held by the society for the benefit of the members who paid it.

2. The mere fact that not all of the members of a beneficial society who were entitled to a fund held by it for their benefit *formally* assented to the segregation of the fund and placing it in the hands of other trustees for their benefit, is no reason for setting aside the transfer, since, in the absence of anything appearing to the contrary, it will be assumed that they all assented to an action so clearly beneficial to them.

3. Where a beneficial society held certain unlawfully exacted excess dues in trust awaiting the result of litigation, and instead of keeping it in the form of cash used it to pay death benefits, so that the death benefit fund became indebted to the excess fund, it was legitimate for the society to use the mortgages in which the death benefit fund was invested to discharge the known indebtedness of that fund to the excess fund.

4. When a beneficial society used cash belonging to an excess dues trust fund to pay death benefits, keeping separate accounts so that the exact amount of the indebtedness of the death benefit fund to each member entitled to a share of the excess fund was capable of being ascertained, then, upon the same being so ascertained, it was proper for the society to pay the money due to the excess fund from the death benefit fund out of the assets of the latter.

5. A beneficial society that uses to its own profit funds held in trust awaiting the result of litigation, is liable for interest on the amount at a rate conformable to the rate it would have had to pay if it had borrowed elsewhere the money for such use.

6. By the statute (*Comp. Stat. p. 442 § 84*), and independent thereof, where the complainant and defendant are each successful on one or more substantial issues, neither is entitled in the court of chancery to costs against the other.

On appeal from a decree of the court of chancery, advised by Vice-Chancellor Leaming.

*Mr. Oscar B. Redrow,* for the appellant.

*Mr. John F. Harned,* for the respondents.

The opinion of the court was delivered by

TRENCHARD, J.

This is an appeal from a decree dismissing a bill filed by the receiver of "Supreme Circle, Brotherhood of America," a beneficial society, to set aside certain assignments of mortgages made by the society under the following circumstances:

The society was incorporated many years ago. In 1890, it organized a death benefit fund for members of the subordinate "circles," collecting the dues through such local circles. In 1909, by amending its by-laws, it attempted to change the rate of dues of members from a flat rate of fifty cents a month to an increased rate graduated upon the ages of the members. On the application of a member who had joined before the adoption of the amendment, a preliminary injunction was issued by the chancellor restraining the expulsion of members who did not pay the increased rate of dues, but refusing to stay the collection thereof. The order provided, respecting such dues, that

"The members may pay the same and such payments will be regarded as made under protest, without formal protest being entered, so that if the suit shall be finally determined in favor of the complainant, the whole class will receive the benefit of the payments."

Accordingly, the supreme circle collected the dues at the new rate, first notifying the local circles that "if the action of the supreme circle, upon final hearing of the cause, is not sustained, the excess will be refunded to the members." On final hearing the increase of dues was held to be illegal (*Poole* v. *Supreme Circle, 85 Atl. Rep. 821*), and that was affirmed in this court. *80 N. J. Eq. 259.*

12

Thereafter two other attempts were made to provide for increased dues, both of which were determined to be ineffectual. *Park* v. *Supreme Circle, 81 N. J. Eq. 330; Park* v. *Supreme Circle, 83 N. J. Eq. 131.*

Then it was that the society determined to finally restore to all members to whom restoration had not already been made all excess dues which had been paid under the three attempted amendments. The amount of such excess dues (inclusive of interest) was $86,778.05. The supreme circle had its death benefit fund largely invested in mortgages. In order to avoid the disturbance of these investments pending the litigation concerning the increased dues, the society had used the excess dues to pay the death benefits as they fell due. Accordingly, it assigned mortgages from the death benefit fund in an amount equal to the indebtedness of that fund to the excess dues fund to certain agreed upon trustees for the benefit of the members who had paid the excess money.

Later, the supreme circle, having voluntarily surrendered its charter, the receiver, appointed to wind up its affairs, filed this bill for the purpose of setting aside the assignments of mortgages so made by the society to such trustees.

We are of the opinion that the decree dismissing the bill should be affirmed.

We think that the society acquired no title to the excess dues paid by the members under the order of the court of chancery providing in effect that they be deemed involuntary payments to be returned to the members if determined by the court to be an unlawful exaction. The court having determined that the by-law requiring such excess payment was illegal, the payment in no sense inured to the benefit of the society, but retained its character as the money of the members who advanced it under the new but invalid by-law. It was held in trust awaiting the result of the litigation. Certainly, such was the intention of the society, and no doubt such was the intention of the members in so far as they are deemed to have had any intention respecting it. The return of the money was delayed, but that did not change the relative rights of the parties respecting it. It is true

that the amended by-law was being attacked by and in behalf of members who joined before it was adopted. But it was the design of the society to enforce that by-law in its entirety or not at all. It was a new condition which the society endeavored to impose upon all its members, present and future alike. It was a new rate of dues graduated according to age, and if it could not be enforced in its entirety as against all the members, old and new, it could not be enforced at all.

The mere fact that not all of the overcharged members *formally* assented to the action of the society in segregating these funds and placing them in the hands of trustees for the several members who were entitled to them, is no reason for disturbing such action, since, in the absence of anything appearing to the contrary, it will be assumed that they all assented to an action so clearly beneficial to them.

It is further contended that the society had no right to transfer the mortgages to repay the overcharged members because it held them in trust for the death benefit fund. But we think a complete answer to this is, that under the circumstances, the unlawfully exacted excess payments made by the members never became the property of the society, but was held in trust awaiting the result of the litigation. Instead of being kept in the form of cash, the cash was used to pay death benefits, so that the death benefit fund really became a debtor to the excess fund. The vice-chancellor held that under these circumstances it was proper to use the mortgages to discharge this indebtedness. We think that was right. The legal situation was that the death benefit fund was indebted to the excess fund, and it was perfectly legitimate to pay money due to the one trust fund from the other trust fund out of the assets of the latter. The fact that the death benefit fund was held by the society as a trust fund can make no difference; the excess fund was also so held.

It is next argued that the segregation of the excess fund, and its transfer to the trustees of the beneficiaries, was not justified because it was not capable of identification. But we think there is no merit in this contention.

No doubt, it would have been better if the society had kept this money separate from any other fund, then there would have

been no question about the identification of the money itself. But this was not done. It was used to pay death benefits as they fell due. However, a separate account was kept so that the exact amount of the indebtedness of the death benefit fund to each member entitled to a share of the excess fund was capable of being ascertained. The amount was so ascertained, and mortgages representing it were taken from the treasury and assigned to the duly-accredited trustees of the members who were entitled to it. We think that there was a sufficient identification of the fund—of the money itself. The identification was impressed upon the funds by the society, who was the trustee thereof. The transaction is not one to be commended because the commingling of trust moneys with other funds should not be indulged, but it is a transaction that equity will sustain so far as the restoration of the trust funds to the beneficiaries is concerned. *Smith* v. *Combs, 49 N. J. Eq. 420; 24 Atl. Rep. 9.*

It is also insisted that the allowance of interest was erroneous. We think not. It appeared that the society in its accounting with the trustees of the overcharged members allowed interest upon the excess funds in its hands. The society having used the fund to its own profit, the vice-chancellor properly allowed interest at a rate conformable to the rate it would have had to pay if it had borrowed elsewhere the money for such use. *Agnew Company* v. *Paterson Board of Education, 83 N. J. Eq. 49; 89 Atl. Rep. 1046; affirmed, 83 N. J. Eq. 336; 90 Atl. Rep. 1135.*

Lastly, it is contended that the vice-chancellor erred in refusing costs to either party. Not so. The contention is based upon the fact that the society, by reason of an erroneous calculation of interest, paid the trustees of the overcharged members $1,126.15 more than it should have paid. This the vice-chancellor ordered repaid, and it was paid to the complainant before the final decree was entered dismissing the bill. By the statute (*Comp. Stat. p. 442 § 84*), and independent thereof, where, as here, complainant and defendant are each successful on one or more substantial issues, neither is entitled in the court of chancery to costs against the other. *Diocese of Trenton* v. *Toman, 70 Atl. Rep. 881.*

The decree below will be affirmed, with costs in this court.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—15.

*For reversal*—None.