STEIN et al. v. DELANO, Comptroller of the Currency, et al.

WALDRON et al. v. SAME.

Nos. 7629, 7644.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

---

[20] 11 U.S.C.A. § 202, sub. d(1).

Saul J. Zucker, of Newark, N. J. (Kristeller & Zucker, Burnett & Trelease, and Charles C. Trelease, all of Newark, N. J., and Armstrong & Mullen and Arthur C. Mullen, all of Jersey City, N. J., on the brief), for appellants Stein and others.

Walter J. Bilder, of Newark, N. J. (Bilder, Bilder & Kaufman, of Newark, N. J., on the brief), for appellants Waldron and others.

Robert F. Darby, of Newark, N. J. (J. H. Harrison, of Newark, N. J., on the brief), for defendant-appellee Preston Delano and others.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

CLARK, Circuit Judge.

The national bank whose difficulties occasioned this litigation was one of the first to bow before the storm. The Comptroller appointed a receiver on June 11, 1932. This stitch seemed very much in time for the subsequent administration of the bank's assets resulted in the full repayment of the principal of the funds deposited. At the beginning of this administration the Comptroller exercised his statutory[1] power to assess the bank's stockholders. This assessment netted $1,000,000 approximately and there now remains on hand $750,000 after payment of the dividends before mentioned. The Comptroller now wishes to use part of these monies to pay interest to the depositors for the amounts which have been withheld from them during all the years the bank was closed and in liquidation. Certain stockholders, by way of a class action, object to such payment and demand the return of what is left of their

---

[1] 12 U.S.C.A. § 63.

assessment. The learned district judge held against them in a reported opinion[2] and they now appeal his decision.

The stockholders' arguments are, we think, more of policy than of law. The hostility to interest is both ancient[3] and deep-rooted.[4] It stems from the stereotyping effect of philosophy and religion on a concept changed after the adoption of the dogma. In a primitive agricultural society the weak and necessitous are at the mercy of the shrewd and unscrupulous. The commercial borrower, on the other hand, needs money to make money and should be treated accordingly.[5] In general realization of this, the Roman law permitted recompense for failure to repay. From this we derive the name itself (id quod interest, that which is between). By the Sixteenth Century the gap between religious theory and commercial practice had been further narrowed. The new Protestant ethical system regarded only excessive exactions as usury. Even then the English law wavered about what was excessive, swinging from statutory maximums[6] to control by the courts of conscience[7] and back to statutory maximums in the case of the poor debtor who took the place of the poor peasant of earlier days.[8] Our own law was formed at the period of rigid maximums. In this country, however, mercantile influence seemed less in awe of traditional theology and the courts were less intransigent toward the extension of the limits of the recovery of interest as damages.[9]

In the case at bar the aversion to paying for the money you hire is combined with another distaste. Stockholders in banks have shown a reluctance to accept the condition upon which they have been allowed to take charge of other people's money. That condition is a partial withdrawal of the shield afforded by the corporate device. The device limits the owner's risk and the creditor's security simultaneously.[10] It seems reasonable to increase both in a business where the owners take most of the profit and the customers take most of the risk. As long ago as 1808 Pennsylvania had had the idea[11] and in 1846 the New York Constitution "reflected the prevailing grievance of the time" and imposed superadded liability about as we know it today.[12] Now nearly a hundred years later the pendulum has swung back and many of the statutes and constitutions imposing liability have been repealed or amended.[13] The exact reason for this

---

[2] Stein v. Delano, 35 F.Supp. 260.

[3] Plato, Treatise de Legibus, v. 742; Aristotle, Politics, 1, 4, 23; Moses, Exodus, XXII, 25.

[4] Holdsworth, 8 History of English Law, 2d Ed., 100–112; Bellott's Bargains With Money Lenders, Chapter 1.

[5] Bacon's Essay on Usury.

[6] 37 Henry VIII, c. 9; 5, 6, Edward VI, c. 20.

[7] See Chesterfield v. Janssen, 1 Atk. 339, 26 Eng.Rep. 191 (1750); Earl of Aylesford v. Morris (1883); ·L.R. 8, Ch. 484.

[8] Money-lender's Acts, 63 and 64 Victoria, c. 51; 1 and 2 George V, c. 38; 17 and 18 George V, c. 21; compare the controversy in our own country over small loan finance companies, Stone and Thomas, California's Legislature Faces the Small Loan Problem, 27 California Law Review 286; Loan Sharks and Loan Shark Legislation, 8 Journal of Criminal Law 69; Bar Defeats Loan Sharks, 10 Missouri Bar Journal 44; Bar Sponsors Anti-Loan Shark Bill, 10 Missouri Bar Journal 3.

[9] 1 Sedgwick, Damages, 9th Ed., § 297; 30 Amer.Jur.Interest §§ 3 and 4, and cases cited; cf. Knight, Interest, 8 Ency. of Social Sciences p. 131; Clark, Capital and Its Earnings, American Economic Association, Monographs, vol. 3, no. 2; Clark, Distribution of Wealth; Fetter, Economic Principles, Pt. 5; Fetter, Interest Theories Old and New, 4 American Economic Review 68; Fisher, The Rate of Interest; Fisher, The Theory of Interest; Cassel, The Nature and Necessity of Interest; Landry, L'interet Du Capital.

[10] The origin of limited liability for stockholders appears to be in dispute. Compare Williston, Law of Business Corporations, 2 Harvard Law Review 105, 149, 160–162 with Warren, Safeguarding The Creditors of Corporations, 36 Harvard Law Review 509, 516–522.

[11] Myers v. Irwin, 2 Serg. & R., Pa., 368.

[12] 3 Zollmann, Banks and Banking, Perm.Ed., § 1611, Early History of Superadded Liability.

[13] 12 U.S.C.A. § 64a; Ga.Laws 1937, No. 492, p. 429, § 1; Ind.Stat.Ann. (Burns, Supp.1939) § 18-1902; Iowa Laws 1936–1937, c. 219, § 1; Kan.Gen. Stat.Ann.(Corrick, Supp.1937) § 9-110; Ky.Stat.Ann.(Baldwin, 1936) § 595; Me. Laws 1935, c. 287, p. 49; Md.Laws 1937, c. 81, § 1; Mass.Ann.Laws (Supp.1938) c. 172, § 24; Mich.Comp.Laws (Mason, Supp.1935) § 11899-1; Nev.Comp.Laws (Hillyer, Supp.1938) § 661; N.Y.Laws

change of legislative heart is not difficult of explanation. The panic of 1929 and the bank failures of 1932–1933 have made bank stockholders into a suffering and so vocal class. Many of them interposed every possible defense against collection.[14] Finally, a combination of these two factors suggested that the stockholders keep the profit, the depositors have their security, and the government take the risk.[15]

We have discussed these two hostilities at some length because they seemed to us the only way of accounting for the earnestness with which the principal case has been pressed. For the law is well-settled and is with the Comptroller.[16] Three reasons are generally given for this rule. The delay in payment is not the act of the debtor but is an act of the law for the mutual benefit of all the creditors.[17] In the case of claims bearing different rates of interest, it would be inequitable to permit the running of interest to increase the proportion of the assets to which some of the creditors are entitled at the expense of other creditors while the estate is in the process of administration.[18] If all claims bear the same rate of interest, the addition of interest would not change the proportion of the assets to which each would be entitled. The computation may therefore be omitted as a useless act.[19] It is apparent that the last two reasons are not valid in the face of a surplus. The logic of a writer in the Michigan Law Review seems unanswerable: "On the other hand, when the surplus is sufficient to pay in full the interest due to all the creditors, a difference in the rates provided by their contracts is not productive of any unjust inequality between them. The rights of one are in no way affected by the amount received by another. An amount equal to the principal is paid to each. Even where the surplus will not pay all the interest in full, no unjust inequality results from dividing it on the basis of different contract rates. The balance remaining due is proportioned to the compensation that each should receive for the use of his money. There is no injustice in computing the proportion of compensation to be received by each creditor on the basis of the rate of compensation for which he contracted. This is an entirely different matter than decreasing the proportion of *principal* to be received by one creditor by adding interest at a higher rate in computing the dividend of another creditor. And where there is a surplus, the computation and addition of interest to all claims at the same rate would no longer be a useless act." Hanson, Effect of Insolvency Proceedings on Creditor's Right to Interest, 32 Michigan Law Review 1069, 1082, 1083.

The third remains but is particularly unsound in the superadded liability cases. In an ordinary involuntary insolvency the prevention of paying may in a sense be attributed to the law and not to the debtor. If there is a surplus, therefore, it may be argued that the proceedings were wrongfully instituted and so the debtor should

---

1936, c. 831, § 120-a; N.C.Code Ann. (1935) § 219(a); N.D.Laws 1937, c. 95; Pa.Stat.Ann.(Purdon, 1939) tit. 7, c. 29, § 819—614; Tex.Const. Art. XVI, § 16; Vt.Pub.Laws (1933) § 6810; Ariz.Const. art. XIV, § 11; Ill.Const. Art. XI, § 6; Minn.Const. Art. IX, § 13; Nebr.Const. Art. XII, § 7; Ohio Const. Art. XIII, § 3; Ore.Const. Art. XI, § 3; S.C.Const. Art. IX, § 18; Utah Const. Art. XII, § 18; Wash.Const. Art. XII, § 11; W.Va. Const. Art. XI, § 6.

14 Banks and Banking—Stockholders' Superadded Liability—Liability for Interest and Cost of Receivership, 39 Columbia Law Review 1414.

15 12 U.S.C.A. § 264. Federal Deposit Insurance Corporation. Of course, the risk is no more than that borne by any insurer and is ultimately distributed among those insured.

16 The cases are collected in 3 Zollmann, Banks and Banking, Perm.Ed., § 1781, Interest on Debt to Which Superadded Liability Attaches; 3 Michie, Banks and Banking, Perm.Ed., § 219 Interest: Right to and Liability For; Banks and Banking—Stockholders' Superadded Liability—Liability for Interest and Cost of Receivership, 39 Columbia Law Review 1414 (note); Banks and Banking—Insolvency and Dissolution—Allowance of Interest on Claims, 3 Detroit Law Review 188.

17 People v. American Loan & Trust Co., 172 N.Y. 371, 65 N.E. 200; Boston & A. R. R. v. Mercantile Trust & Deposit Co., 82 Md. 535, 34 A. 778, 38 L. R.A. 97; Attorney General v. Supreme Council A. L. H., 206 Mass. 131, 92 N.E. 134.

18 American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949; People v. Merchants' Trust Co., 187 N.Y. 293, 79 N.E. 1004.

19 In re John Osborn's Sons & Co., 2 Cir., 177 Fed. 184, 29 L.R.A.,N.S., 887.

be excused from paying interest during the delay. Even here a large majority of the creditors may have nothing to do with the commencement of the proceedings and the debtor may be at fault in conducting his business in such a way as to subject himself to reasonable suspicion of insolvency. In the bank cases the surplus arises only from the very cause that the stockholders now assign as an excuse for getting it back. Zollmann, a leading authority on the subject, puts it thus: "Where a bank is so badly insolvent that the entire superadded liability of the stockholders when collected is insufficient to pay the principal of its debt, no question can arise whether its creditors are to receive interest. Any computation of such interest would be a useless effort. However, some of the bank failures are not of this description. It happens that a *portion* of the superadded liability is sufficient to pay the principal of all the debts. The question then arises whether the creditors are entitled to interest as against the stockholders. It is clear that the contracts, debts, and engagements of the bank have not been fulfilled so long as interest is unpaid. It may be a hardship on the stockholders to hold them for interest accruing during the delay of administration. It certainly is a hardship on the creditors to lose this interest. The question, however, is not one of hardship, but of legal right. Within the statutory limits the stockholder is bound for the whole debt and not for a part of it * * *.

"A depositor whose claims are due on demand is entitled to interest on his deposits from the time when the bank becomes insolvent, closes its doors, and suspends payment * * *." 3 Zollmann Banks and Banking, Perm.Ed., § 1781.[20]

■ The only escape from the authorities lies in accession to the arguments with which we began this opinion. They are, as we pointed out, considerations of policy. We do not happen to agree with the policy and are therefore happy in following what we consider binding authority,

alterable as always by legislative action. The appellants' attempt at avoidance by way of distinction does not impress us. They argue first that the stockholders' responsibility is limited by the statutory language, "contracts, debts, and engagements",[21] and second that the acceptance of the principal waives the right to interest. To so interpret the statute would be to interpolate the words "principal amount of" before "debt". That would, of course, be contrary to a general usage whereby the latter term connotes no such qualification. The authorities are unanimous in their rejection of any such view. Fletcher Cyclopedia Corporations collects them and says: "When a liability for interest is a debt against the corporation, it is like any other debt, and the stockholders are liable therefor, as well as for the principal, provided, of course, they are not thereby held to any greater liability in amount than is fixed by the statute. The statutory liability of stockholders extends to interest on the debts of the corporation during the administration of its affairs in case of bankruptcy, insolvency, or receivership, where, because of the nature of the debt, the right to recover interest would have existed against the corporation * * *." 13 Fletcher Cyclopedia Corporations § 6299.

■ The rule as to waiver of interest is equally inapplicable. It does not apply in receiverships for the reason that during the administration nothing could have been accomplished by a formal demand for interest. Until the principal of all the claims are paid it can not be known whether the estate would have enough remaining assets to make payment upon the interest. Therefore there can be no waiver of the claim for interest.[22] The writer of the law review article from which we have already quoted summarizes the matter thus: "Even if it be conceded that the dividends are principal, it should not follow that the obligation for interest is thereby extinguished. The rationale of the general rule in this regard is that when the creditor

---

[20] Creditors' Rights—Banks and Banking—Secured Creditors' Rights to Lien for Interest and Principal of Debt Owed By An Insolvent Bank, 24 Virginia Law Review 803 (note); Glenn, Liquidation § 488.

[21] 12 U.S.C.A. § 63.

[22] State ex rel. McConnell v. Park Bank & Trust, 151 Tenn. 195, 268 S.W.

638, 39 A.L.R. 449; Greva v. Rainey, 2 Cal.2d 338, 41 P.2d 328; Flynn v. American Banking & Trust Co., 104 Me. 141, 69 A. 771, 19 L.R.A.,N.S., 428, 129 Am. St.Rep. 378; Parker v. Adams, 38 Misc. 325, 77 N.Y.S. 861; see, also, 39 A.L.R. 457; Ohio Savings Bank & Trust Co. v. Willys Corp., 2 Cir., 8 F.2d 463, 44 A. L.R. 1162; Glenn, Liquidation § 488.

*voluntarily* accepts the principal as such, he ought to be regarded as having waived the interest. In the insolvency cases there is no voluntary acceptance of principal because the creditor is precluded from rejecting the dividends and demanding payment of principal and interest in full." Hanson, Effect of Insolvency Proceedings on Creditor's Right to Interest, 32 Michigan Law Review 1069, 1085.

■ Although not mentioned below, the appellants now argue against the imposition of the legal rate of interest. They claim that the statute[23] authorizes the payment of the prevailing interest rate with a maximum of six per cent. This contention is in accord with economic law.[24] As we have pointed out earlier, however, our law is derived from the period of compromise between no interest and usury. In New Jersey there can be no doubt.[25] The appellants cite in support of their argument three cases.[26] The two latter are not in point. In each the defendant wrongfully withheld money from the plaintiff in lieu of borrowing that sum. The defendant was therefore assessed for the amount he profited by the use of the wrongfully withheld money—its interest at the rate he would have had to pay for the loan. But the New Jersey National Bank and Trust Company did not profit to any ascertainable amount by becoming insolvent and failing to pay its depositors. It is being assessed interest for the damage it did its creditors, rather than for any profit it obtained from the failure to honor its debts. The remaining authority, Mayor, etc., of Jersey City v. O'Callaghan, is said to contain language which states that the statutory rate is merely the presumed legal rate.

"The law takes the legal rate of interest as the fair measure of such damages, on the theory that if the money had come to hand it would have produced that rate. The law endeavors to indemnify the party injured, and as the injury consists in the loss of the use of money, such indemnification will be afforded by giving the value of such use, *which it is presumed is the*

*interest at the rate fixed by law,* and to accomplish this it is obvious that when the rate of interest is changed, the standard of damages is necessarily changed, for to take either the greater or lesser sum of the varying interest would be to use a gauge out of proportion to the loss, and would manifestly fail to produce a just compensation. * * * *To compensate the party injured, and to do nothing more than to compensate him, the measure of damage should be the rate of interest as it is varied by legislation during the period of damage.*" Mayor, etc., of Jersey City v. O'Callaghan, 41 N.J.L. 349, 354 (italics ours).

We believe that the appellants have twisted the meaning of this opinion by attaching overdue importance to the words first italicized and not enough to the second italicized sentence. If the statute is presumed to be the legal interest rate, that presumption is conclusive. Our construction of the decision is the one adopted by the New Jersey courts.

"The rate chargeable for the forbearance of money is, in the absence of agreement to the contrary, the legal rate. [Mayor, etc., of] Jersey City v. O'Callaghan, 41 N.J.L. 349, is in point. It was there held by the Court of Errors [and Appeals] that where damages for breach of contract are to be assessed, or where an equivalent is to be given for the use of money forborne, the statutory rate is the rate to be computed. If, then, interest be given at all, it would be given at the rate of 6%." Jersey City v. Flynn, 74 N.J.Eq. 104, 124, 70 A. 497, 505, modified as to another point, Jersey City v. Jersey City Water-Supply Co., 76 N.J.Eq. 607, 76 A. 3.

■ The learned trial court quashed the summons against the Comptroller. As we view it, the question there involved, although interesting, need not have been considered. The Comptroller's agent, the receiver of the bank, has appeared in the action and will be bound by our decision.[27] That being so, any adjudication with respect to jurisdiction over the Comptroller would be in the form of an advisory opin-

---

[23] N.J.R.S. 31:1–1, N.J.S.A. 31:1–1. Even before Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, Federal courts awarded interest on damages at rates set by state law. See interest Rates in Federal Courts, 44 Harvard Law Review 105.

[24] Knight, Interest, 8 Ency. of Social Sciences 131.

[25] Jersey City v. Flynn, 74 N.J.Eq. 104, 70 A. 497.

[26] Mayor, etc., of Jersey City v. O'Callaghan, 41 N.J.L. 349; Agnew Co. v. Paterson Bd. of Education, 83 N.J.Eq. 49, 89 A. 1046; Horner v. Heinecke, 86 N.J. Eq. 176, 98 A. 393.

[27] Appendix to appellees' brief, p. 9.

ion.[28]  That the courts of this country are not authorized to give.

The judgment of the District Court is affirmed.

[28] Hudson, Advisory Opinions of National and International Courts, 37 Harvard Law Review 970; Frankfurter, A Note on Advisory Opinions, 37 Harvard Law Review 1002; The Advisory Opinion and the United States Supreme Court, 5 Fordham Law Review 94, 114 (note); cf. Borchard, The Constitutionality of Declaratory Judgments, 31 Columbia Law Review 561.