**LITTLETON v. KINCAID et al.**

No. 5962.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 12, 1949.

Decided Jan. 12, 1950.

See also 166 F.2d 1007.

7. Pennsylvania Business Corporation Law, Sec. 1105, 15 P.S.Pa. § 2852—1105.

850

Leslie C. Garnett, Washington, D. C. (Samuel F. Beach, Washington, D. C., on the brief), for appellant.

Clarence R. Ahalt, Arlington, Va., and Elijah B. White, Leesburg, Va., for appellees Mary W. Rust, and others, holders of first trust notes, Estate of William A. Metzger and Clarence R. Ahalt.

Stilson H. Hall, Leesburg, Va., and T. Bruce Fuller, Washington, D. C., for appellees R. H. McNeill and Coleman C. Gore.

Armistead L. Boothe, Alexandria, Va., for appellee John F. Kincaid.

Before SOPER and DOBIE, Circuit Judges, and BARKSDALE, District Judge.

SOPER, Circuit Judge.

The appeal in this case is taken from an order of the District Judge which approved, with minor modifications, the distribution of the proceeds of the sale of the property of the farmer-debtor proposed in the report of the conciliation commissioner under the Frazier-Lemke Act, 11 U.S.C.A. § 203 et seq.

Frank Campbell Littleton, the owner of Oak Hill, the historic place of James Monroe in Loudon County, Virginia, filed a petition under the statute June 18, 1941 stating that he was engaged in producing products of the soil and live stock, and that he was unable to meet his debts as they matured and desired to effect a composition or extension of time to pay his debts under Section 75 of the Bankruptcy Act. At that time there was pending in the Circuit Court of Loudon County, Virginia, a suit by Littleton to enjoin the sale of the property which had been advertised by William A. Metzger and David N. Rust, Jr., trustees under a deed of trust of August 29, 1939, to whom Littleton had conveyed the property to secure the payment of certain promissory notes in the aggregate sum of $110,000.

When the injunction suit was filed in the state court, the trustees under the deed of trust retained Clarence R. Ahalt as their attorney to defend the suit. It transpired that Rust, one of the trustees, was disqualified to act as such since he was in an inconsistent position, being not only trustee but the owner of the indebtedness represented by the promissory notes, and consequently he resigned as trustee. The court then referred the case to a commissioner and upon his report, decreed the advertisement and sale of the property and designated Metzger as the trustee to accomplish this purpose. The filing of the petition in the federal court put a stop to the proceedings in the state court, as provided by Section 75, sub. o, 11 U.S.C.A. § 203, sub. o, of the Frazier-Lemke Act, and proceedings under the federal statute ensued. The debtor's petition was approved and the matter was referred to John F. Kincaid, conciliation commissioner for Loudon County. The debtor, however, was unable to effect a composition with his creditors and on December 19, 1941, upon his amended petition, he was adjudicated a bankrupt and the matter was referred to the conciliation commissioner for further proceedings under Section 75, sub. s of the Bankruptcy Act. Three appraisers were appointed who appraised the real estate and farm equipment at $199,886.75, and three other appraisers appraised the furniture and household goods at the sum of $21,612.85; and it was ordered that the property remain in the possession of the debtor subject to the further order of the court. During the ensuing years, many questions were brought to the attention of the conciliation commissioner and the court, and finally the court appointed trustees to make a sale, who on September 2, 1948, sold the property for $220,000, which was sufficient to pay all of the claims against the debtor with interest, as well as the expenses of the proceedings, and to leave a surplus of approximately $20,000 for the farmer-debtor. The purchase price of the property was paid and deposited in the registry of the court on December 16, 1948.

After the sale, the debtor moved that the case be referred to the regular referee in bankruptcy to make a report as to the transactions of the conciliation commissioner, but the court denied this petition and ordered that the conciliation commissioner, acting as referee, convene the creditors and ascertain the amounts due them and report to the court a scheme of distribution of the funds on deposit to the credit of the cause. Accordingly, the conciliation commissioner on April 13, 1949 reported a scheme of distribution of the funds to the creditors which after certain modifications, was approved by the District Judge. The final order directed that the claims against the bankrupt estate should bear interest to May 1, 1949; that the trustee appointed by the state court in the foreclosure proceedings should be allowed the sum of $1,000, that the attorney for the said trustee should be allowed a fee of $500 for services rendered therein; that the conciliation commissioner should be allowed the sum of $1,877.13, being 1 per cent. of the amount to be paid to creditors, for his services as referee in

the proceeding, and the additional sum of $1,850 for services as conciliation commissioner during the period of more than seven years; that three appraisers appointed to appraise the real estate be each allowed the sum of $100 for services rendered, and that three appraisers appointed to appraise the personal property of the debtor be each allowed the sum of $150 for their services, and that Robert H. McNeill, attorney for the debtor, and Coleman C. Gore, his associate, be paid the sum of $38,406.26, which represented the amount of their claim against the estate with interest based upon an assignment on February 5, 1948 of a note of the debtor of February 4, 1941 for $27,200.92 with interest of approximately $9,000, which was held by Frank Campbell Littleton, Jr., the son of the debtor. These allowances in the scheme of distribution constitute the subject matter of this appeal.

The first question relates to the allowance of interest to May 1, 1949 on mortgage notes given by the debtor on August 29, 1939 in the sum of $110,000 which at the time of the report of the conciliation commissioner were held by D. N. Rust, Jr., and others under a deed of trust of that date; and also the allowance of interest to May 1, 1949 on the note of the debtor in the sum of $27,300.92 of February 4, 1941, payable to Frank Campbell Littleton, Jr. and secured by a second deed of trust, and assigned by the holder to Robert H. McNeill and Coleman C. Gore on February 5, 1948. Ordinarily interest on claims against a bankrupt estate runs to the filing of the petition in bankruptcy, which in this case was filed on December 19, 1941. Section 63, sub. a (1, 5), 11 U.S.C.A. § 103, sub. a (1, 5), of the Bankruptcy Act; City of New York v. Saper, 336 U.S. 328, 69 S.Ct. 554; Collier on Bankruptcy, 14th Ed., Vol. 3, p. 1835 et seq. As was pointed out by Mr. Justice Holmes in Sexton v. Dreyfus, 219 U.S. 339, 344, 31 S.Ct. 256, 55 L.Ed. 244, this rule is not a matter of legislative command or statutory construction but, rather, a fundamental principle of the English bankruptcy system which we adopted. Three reasons are usually given for its existence: (a) The delay in payment is not the act of the debtor but is an act of law for the mutual benefit of the creditors. (b) In the case of claims bearing different rates of interest, it would be inequitable to permit the running of interest to increase the proportion of the assets to which some of the creditors are entitled at the expense of the other creditors while the estate is in the process of administration. (c) If all claims bear the same rate of interest, the addition of interest would not change the proportion of assets to which each would be entitled, and the computation may therefore be omitted as a useless act. Clearly the last two reasons for denying interest subsequent to the petition cease and the first loses its force, especially in the case of a voluntary proceeding when the assets are more than sufficient to pay all the claims in full. See, Hanson, Effect of Insolvency Proceedings on Creditor's Right to interest, 32 Mich.L.Rev. 1069; Stein v. Delano, 3 Cir., 121 F.2d 975, 978. Accordingly, when this unusual event occurs interest is payable out of this surplus to the date of payment. Johnson v. Norris, 5 Cir., 190 F. 459; City of New York v. Saper, supra, 336 U.S. at page 330, 69 S.Ct. 554, note 7; American Iron & Steel Mfg. Co. v. Seaboard Air Line, 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949; Miles Corp. v. Lindell, 8 Cir., 107 F.2d 729; In re Hopkins, D.C.R.I., 15 F.2d 206; In re Norcor Mfg. Co., D.C., E.D.Wis., 36 F.Supp. 978; Brown v. Leo, 2 Cir., 34 F.2d 127.

It is held under certain circumstances that interest is not payable on funds in custodia legis, and hence the debtor contends that interest in the pending case should not be allowed after December 14, 1948, when the purchase price of the property was paid into court. This rule is applied when the debt is secured by mortgage on real estate or collateral which yields interest or dividends during the pendency of the proceedings, in which case the income is applied to the payment of the interest until the day of the sale. Coder v. Arts, 8 Cir., 152 F. 943, affirmed 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772; Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 55, 256 L.Ed. 244; Collier on Bankruptcy, supra, page 1840. The reason for the allowance of interest subsequent to the beginning of

the proceeding is that the collateral is security for the payment of the interest as much as the payment of the principal. Coder v. Arts, supra; Mortgage Loan Co. v. Livingston, 8 Cir., 45 F.2d 28. But the reason for the stoppage of interest on funds in custodia legis is not because the claims lose their interest bearing quality, but because of the inequality which would otherwise result in the forced distribution in receivership to debts carrying different rates of interest. This inequality, however, disappears when there is a surplus and then interest is allowed even while the funds are in custodia legis. American Iron & Steel Mfg. Co. v. Seaboard Air Line, 223 U.S. 261, 266, 34 S.Ct. 502, 58 L.Ed. 949; Johnson v. Norris, supra.

The debtor makes the alternative contention that interest in this case should not run beyond February 14, 1949, because on that date he moved the court to pay out the funds in the registry the full amount of the first trust lien notes with interest to that date, amounting in the aggregate to $136,788.14. This motion was opposed by the noteholders because the debtor would not also agree to the payment in full of the claims of the trustee and his attorney for compensation for services rendered in the foreclosure proceedings in the state court, and the District Judge denied the motion on this account. We find no error in this action. It is true that there was at the time in the registry of the court sufficient funds to pay all the debts and claims against the estate, but the accounting had not been finished and the Commissioner had not made the report determining the amounts due the estate in accordance with the order passed on February 4, 1949. The scheme of distribution of the commissioner was not filed until April 13, 1949. It was within the discretion of the court to retain within the registry the proceeds of the sale until an account had been stated and the amount of the entire indebtedness and costs had been ascertained.

The next question is whether the trustees under the first deed of trust and their attorney are entitled to compensation for services rendered in the suit in the state court. Metzger and Rust, Jr., as we have seen, were trustees under a deed of trust of the property to secure notes in the aggregate sum of $110,000. As such trustees they advertised the land to be sold at public auction on March 6, 1941, and took other steps to promote the sale. The sale was halted when the debtor brought suit to enjoin them in the state court, alleging numerous reasons why the sale should not be made. In this action they were defended by C. A. Ahalt, an attorney. Before the suit was disposed of, Rust resigned by reason of disqualification as shown above, and the petition in bankruptcy was filed on June 18, 1941. The conciliation commissioner in the bankruptcy case, acting as referee, allowed the trustees under the deed of trust $2,000 and the attorney $500 for services rendered in the state proceeding. The District Judge rejected the allowance to Rust of the sum of $1,000 but allowed $1,000 to Metzger and $500 to Ahalt, to which allowances the debtor objects on this appeal.

As to Metzger, it is contended that compensation for services rendered by him under the deed of trust is governed by Section 5167 of the Virginia Code which provides for compensation of the trustee only in case he sells the property. It it true that the Virginia statute makes no express provision for compensation under other circumstances but it is established by the Virginia decisions that if a trust has been partially executed, the court which has jurisdiction over the estate may consider and determine the amount of compensation to be paid the trustee for services rendered. In accordance with this rule, fair compensation has been allowed to a trustee when he has been directed to advertise the property as trustee and has done so, and the debt has been paid before the date fixed for the sale. The accepted rule is that the court shall exercise just discretion and make or withhold allowances as the peculiar circumstances require. Dillard v. Serpell, 138 Va. 694, 123 S.E. 343; Russell Ex'rs v. Passmore, 127 Va. 475, 103 S.E. 652.

It is also well settled that a trustee who engages the services of an attorney in good faith to aid him in the ex-

ecution of his deed is entitled to pay him out of the trust fund. Cochran v. Richmond, 91 Va. 339, 21 S.E. 644; Patterson v. Trust Co., 156 Va. 763, 159 S.E. 168. It is obvious that the services of an attorney were required when the debtor brought suit against them to enjoin the performance of the duty imposed upon them by the deed of trust. We find no error in these allowances.

The debtor also objects on this appeal to the allowance of $1,877.13 to the conciliation commissioner for the services rendered as referee, that is to say, 1% on the amount of money to be distributed to creditors, and the additional sum of $1,850 for services in the inspection of the property and consultation and correspondence with numerous attorneys during the pendency of the bankruptcy proceeding between 1941 and 1949.

In reporting a scheme of distribution to the court, the conciliation commissioner allowed himself $2,200, that is, 1% of the sales price of $220,000 for the first item above mentioned, and the sum of $2,400 for the second item. The judge reduced the first amount to $1,877.13, that is, 1% of the amount to be paid to creditors, following the terms of Section 40 of the Bankruptcy Act, 11 U.S.C.A. § 68, with respect to the commissions allowed referees from the estates administered by them; and he also reduced the second item from $2,400 to $1,850. While expressing some doubt as to the propriety of the allowance of the second amount under the terms of the statute, he said:

"While I realize that the Frazier-Lemke Act was passed primarily for the benefit of distressed farmers, I can not believe that Congress intended that a person should serve as conciliation commissioner over a period of years and subsequently as referee over an additional period of years and receive a fee of only $35.00 for this service.

"In the case now before the Court, the Conciliation Commissioner has found it necessary to deal with some eighteen different lawyers who at one time or another have served as counsel for the debtor in addition to counsel for the various creditors. He has found it necessary to attend court hearings on numerous days. He has had many hearings in his office. It has been necessary for him to inspect the property of the debtor periodically, that he keep insurance in effect and various other duties have devolved upon him. The record discloses that in few, if any, instances he has received co-operation from the debtor. On the contrary, the debtor has presented innumerable obstacles to various efforts exerted by the Commissioner for the benefit of creditors and for the benefit of debtor's estate. On a number of occasions the debtor has harassed the Commissioner unnecessarily and has occasioned him trips from Loudon County to Richmond to assert trivial objections to items of expense involving nominal amounts. The services rendered by the Commissioner have really been in the nature of those rendered by the supervising commissioner and while I have some doubt as to this portion of the Commissioner's claim, I do feel that fairness and equity demand that he, at the least, be compensated for time actually spent by him over a period of approximately seven years. It must be borne in mind that this is not a fee charged to the debtor but is chargeable to the debtor's estate which has benefited and profited by the services rendered by the Commissioner and Referee. I am therefore allowing a fee of $1,850.00 on this claim, being at the approximate rate of $250.00 per year during the term of his services."

This just appraisal of the work of the conciliation commissioner demonstrates that he has fully earned the amounts allowed by the District Court, and it is with regret that we are obliged to set them aside, especially as the services were rendered to an estate of substantial size which has been so handled as to pay all the claims against it and leave a surplus of $20,000 for the debtor. Unfortunately the fees of the conciliation commissioner are so rigidly fixed by the statute as to leave little or no discretion to the courts. Section 75, sub. b, 11 U.S.C.A. § 203, sub. b, provides that the conciliation commissioner shall receive as compensation for his services a fee of $25 for each case submitted to him, to-

be paid out of the Treasury when he completes the duties assigned to him; and that a supervising conciliation commissioner shall receive as compensation for his services a per diem allowance to be fixed by the court in an amount not in excess of $10 per day with subsistence and travel expenses to be paid out of the Treasury in accordance with the law applicable to officers of the Department of Justice. Section 75, sub. s (4), 11 U.S.C.A. § 203, sub. s (4), provides that the conciliation commissioner shall continue to act, and act as referee when the farmer-debtor amends his petition and asks to be adjudged a bankrupt, and that the conciliation commissioner, as such referee, shall receive such an additional fee for his services as may be allowed by the court not to exceed $35 in any case, to be paid out of the bankrupt's estate. The section further provides that no additional fees or costs of administration or supervision of any kind shall be charged to the farmer-debtor, but all such additional filing fees or costs of administration or supervision shall be charged against the bankrupt's estate.

General Order in Bankruptcy 50, par. 12, 11 U.S.C.A. following section 53, provides that the $25 fee of the conciliation commissioner and the fees and expenses of the supervisory conciliation commissioner shall be payable out of appropriated funds, in accordance with instructions issued by the Attorney General.

■ The conciliation commissioner in this case was not appointed as a supervising conciliation commissioner and his fee must be therefore confined to the sum of $25 as provided by the statute, plus the allowance of $35 for acting as referee, the former sum to be paid out of the Treasury and the latter out of the assets of the estate. The question of the conciliation commissioner's fee has not been frequently considered by the courts, but such decisions have been rendered are in accordance with these conclusions. See Rancho San Carlos, Inc., v. Green, 9 Cir., 93 F.2d 338; In re Shindler, D.C.E.D.Wash., 38 F.Supp. 1021; In re Durst, D.C.S.D.Iowa, 44 F.Supp. 486; see also Adair v. Bank of America, 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889. In re Hargrove, 5 Cir., 96 F.2d 168.

We next consider the allowance of $100 each to three persons who appraised the real estate and $150 to each of three others who appraised the personal property of the debtor. The services rendered by the appraisers were thus described in the opinion of the District Court which indicates that the fees allowed were well earned. The court said:

"* * * The Frazier-Lemke Act provides that upon the farmer-debtor filing his petition an appraisal shall be made of his property. This appraisal is made for the benefit of the debtor, the creditors and the court and the amount to be allowed for such appraisal is necessarily to be determined under the facts of each particular case. When the amount of real estate, considered in acreage, involved in this proceeding, the number of buildings thereon, the peculiar nature of the real estate, and the time consumed by the appraisers, are all considered, it strikes me that a fee of $100.00 for each appraiser is reasonable and should be allowed.

"In this same objection to appraisers' fees the debtor has objected to the fees allowed the appraisers of the debtor's personal property. At the time these appraisals were made it was not known whether the real estate or the personal property, or both, if it subsequently became necessary to sell them, would bring a sum sufficient to pay all claims against the debtor. It was therefore necessary that the personal property also be appraised.

"The personal property involved in this proceeding consists of several thousand items, some of which have large and peculiar values due to their history and manner of acquisition by former owners. Much of it is considered antique and therefore of unusual value. Other items are the usual household furnishings and farming equipment. Some of the items consisted of live stock and farming equipment and machinery. A casual glance at the inventory filed in this proceeding discloses the nature and extent of the personal property. Much time was necessarily consumed in appraising

this property, item by item. In view of these circumstances it is my opinion that the fee of $150.00 allowed each of the appraisers for appraising the personal property is reasonable and should be approved."

The objection to the allowance is based on General Order 45 in Bankruptcy which provides: "No auctioneer or accountant shall be employed by a receiver, trustee * * * except upon an order of the court expressly fixing the amount of the compensation or the rate or measure thereof. The compensation of appraisers shall be provided for in like manner in the order appointing them."

In the case of In re Benjamin Kaufman, Inc., D.C.S.D.N.Y., 21 F.2d 799, an allowance to appraisers was denied because the referee's order appointing them did not fix their compensation, as required by the General Order. We disagree with this view. We regard the rule as directory and not mandatory. It was passed to promote the interests of the debtor under a statute enacted in time of national emergency, and the court was directed to fix the fees in advance so that the estate would be protected from exorbitant allowances and the appraisers would know when they consented to serve the amount of compensation they might expect. The rule emphasizes the duty of the court in this case to scrutinize the allowance with care. This has been done, and it is clear that the amounts are just and reasonable, and they should not be disallowed in the absence of a mandatory provision prohibiting the payment or any allowance unless the fees are fixed in advance.

Finally, the objection to the allowance of $38,406.26 on the claim assigned to Robert H. McNeill and Coleman C. Gore by the debtor's son remains to be considered. The assignees paid $18,600 for this claim on February 5, 1948, so that the difference between this sum, plus interest thereon, and the amount represented a profit of the claimants. The debtor contends that the allowance should be restricted to the amount paid for the assignment, plus interest, because McNeill was his attorney

and was actively engaged on his behalf in resisting the sale of the property when the claim was purchased. It is pointed out that the attorney, upon the acquisition of the note, became a creditor of the estate and thereby assumed a position inconsistent with his duty to the debtor to prevent the sale as long as possible in the hope that the debtor might be able to borrow enough money to pay his debts and retain possession of the property. It is contended that under these circumstances the attorney now holds the claim for the benefit of his client just as a trustee who sells himself the property of his beneficiary must hold it for the latter's benefit and account to him if the property was sold for less than its fair value.

The facts with respect to the acquisition of the note are stated as follows in the opinion of the District Judge: " * * * Several years ago the debtor executed a note secured by a second deed of trust on the property sold in this proceeding and on personal property. This note was owned for several years by Frank Campbell Littleton, Jr., a son of the debtor. It was listed as a debt due by the debtor in this proceeding and all during this proceeding the son, by counsel, has made every reasonable effort to have the property of the debtor sold so that his claim, along with the debtor's other debts, might be paid. Counsel for the debtor's son has repeatedly insisted that the property be sold at the earliest opportunity. As a matter of fact, the holder of this note has been actually more insistent that his claim be paid that the holders of the first deed of trust notes. Some time before the son sold his note to Gore and McNeill, he became seriously involved financially and was being threatened with criminal prosecution for issuing certain checks which he did not have sufficient funds to pay. In his distress the son went to the debtor to see what financial arrangements the debtor could make to pay this note and the debtor was unable to pay. The son then, with the acquiescence, consent and approval of the debtor, requested McNeill and Gore to sell the note to any person interested in buying it. Gore solicited ten or twelve persons

with the idea of disposing of the note for the best price he could get, hoping to get around $18,000 for the note but authorized to sell for less. For numerous reasons no person could be found who was interested in purchasing the note. It was generally known that it was a second deed of trust note, that the property securing the note was involved in this bankruptcy proceeding and that the maker of the note had the reputation of being difficult to deal with. All of these facts were known to the son, to the debtor and to McNeill and Gore. Not being able to dispose of the note to outside interests, the son finally solicited McNeill and Gore to purchase the note themselves. It is my finding that the debtor not only knew and consented to the purchase of the note by McNeill and Gore for the sum which they paid for same, but that he acquiesced, consented, agreed and solicited them to purchase the note with full knowledge of the purchase price and all of the other attending circumstances. After borrowing money and making financial arrangements for purchasing the note and after purchasing same, McNeill and Gore learned that counsel for the son claimed a lien on the note for attorney's fees for representing the son in this proceeding. To free this claim from this lien McNeill and Gore paid this fee."

The efforts of the attorney on behalf of the debtor did not slacken and the debtor's interest in the retention of the property was not jeopardized after the assignment. The contrary occurred. On this point the District Judge found:

" * * * Prior to the time McNeill and Gore acquired the note, the then holder, the debtor's son, had pressed for a sale of the property. After acquisition of the note by McNeill and Gore, McNeill, as attorney for the debtor, appeared before this court on numerous occasions over a period of approximately fourteen months solely for the purpose of delaying a sale of the property so that the debtor might rehabilitate himself and pay his debts and retain the property. During this period the debtor was insisting that if allowed only a short extension, he would be able to dis-

charge all his obligations. The records of this court and of the appellate court, Littleton v. Rust, 4 Cir., 166 F.2d 1007, will show that Mr. McNeill diligently sought to obtain the delay desired by his client and he actually succeeded in staving off the final day for about fourteen months. During this period, Mr. McNeill proposed to a lending institution that if such institution would lend the debtor a sufficient sum to pay all of the debtor's debts that the debtor would give such institution a first deed of trust for this entire amount and that for their claim McNeill and Gore would take a second deed of trust subordinate to whatever amount a lending institution might lend the debtor.

" * * * It is my opinion that the note was purchased by McNeill and Gore at a time and under such circumstances as an outside person or lending institution would not ordinarily have been interested in acquiring the note. McNeill and Gore took a chance on purchasing this note and if this chance now results in a profit to them I see no reason why a profit should not be realized where the transaction was in good faith and fair and was entered into with the full knowledge, consent, acquiescence and on the suggestion of the debtor. I find nothing to criticize in the conduct of Mr. McNeill. The claim here discussed will be allowed in full."

The point under consideration must be decided in view of the universally recognized principle that the attorney occupies towards his client a high position of trust and confidence so that it is a lawyer's duty in dealing with his client to exercise the utmost good faith, integrity, fairness and fidelity. Consequently the measure of good faith which the attorney is required to exercise in dealing with his client is much higher than that required when the parties deal with each other at arms length; and all dealings between attorney and client will be closely scrutinized by the courts. These axioms are accepted and observed by all honorable attorneys, as a matter of course and they have been embodied in the canons of professional ethics promulgated by the American Bar Association and the

Virginia Bar Association. These canons provide that the lawyer should not purchase any interest in the subject matter of the litigation which he is conducting (Canon 10 of the American Bar Ass'n) and that he should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposea in him by his client (Canon 11).

These maxims have the general endorsement of the bench and bar. Any dealings between attorney and client, looking to the acquisition by the attorney of an interest in the subject matter of the litigation cannot be approved, for however open and free from fraud it may be, it is likely to place the attorney in an inconsistent position and lead to difficulties and criticism, as the case here well illustrates. Nevertheless we are unable to set the transaction aside as illegal or impose upon the assignees the duty of a trustee to account for the profit that will be acquired. There was no fraud and no concealment in the business, but all the facts were well known to the debtor. Indeed the claim was purchased with the debtor's knowledge and at his request and the price paid was the best that could be obtained after considerable effort had been made to sell the claim that was secured only by a junior mortgage on the property. Moreover, it must be borne in mind that the sale of the entire property of the debtor at Oak Hill for $220,000 was not made until September 2, 1948.

We had occasion in Goldman v. Caplan, 4 Cir., 170 F.2d 503, to refer to the strict accountability under the Virginia law of a trustee to his beneficiary in respect to transactions between them. We pointed out that where the trustee, with the consent of the beneficiary, sells trust property to himself it is not enough that the beneficiary had full knowledge of all the facts and of his legal rights, and that his consent was not improperly induced by the trustee. It is essential also that the sale should be at a price which is fair and reasonable. The same general principle is applicable in Virginia in respect to dealings between attorney and client. See Byars v. Stone, 186 Va. 518, 42 S.E.2d 847; Thomas v. Turner, 87 Va. 1, 12 S.E. 149, 668; Stiers v. Hall, 170 Va. 569, 197 S.E. 450; Branch v. Buckley, 109 Va. 784, 65 S.E. 652. In Thomas v. Turner, supra, it was said:

"According to that rule all dealings between attorney and client, for the benefit of the former, are not only regarded with jealousy and closely scrutinized, but they are presumptively invalid on the ground of constructive fraud, and that presumption can be overcome only by the clearest and most satisfactory evidence.

"* * * All transactions * * * in a court of equity must be *uberrima fides,* and the *onus* is on the attorney to show not only that no undue influence was used or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair; (2) that it was entered into by the client freely; and (3) that it was entered into with such a full understanding of the nature and extent of his rights as to enable the client to thoroughly comprehend the scope and effect of it. * * *" 87 Va. at page 12, 12 S.E. at page 153.

and in Byars v. Stone, supra, it was said: "An attorney occupies toward his client a high position of trust and confidence, and in his relations with his client it is his duty to exercise and maintain the utmost good faith, integrity, fairness and fidelity. This relationship precludes the attorney from having any personal interest antagonistic to those of his client, or from obtaining any personal advantage out of the relationship, without the knowledge or consent of his client. 7 C.J.S., Attorney and Client, § 125, p. 957." 186 Va. at page 529, 42 S.E.2d at page 852.

The facts in this case, as found by the District Judge, fall within these principles. The debtor was fully aware of all the pertinent facts. He was necessarily acquainted with the nature and value of the assigned claim and of the property by which it was secured. He well knew of

the unsuccessful efforts that had been made to sell the claim for the amount for which McNeill and his associate paid for it, and he not only consented to the transaction but was anxious that it be effected. It follows that the decision of the court allowing the claim in full was correct, and must be sustained.

The judgment of the District Court is affirmed except as to the allowance to the conciliation commissioner, and as to this it is modified as hereinabove set out.

Affirmed in part, modified in part, and remanded for further proceedings.

BARKSDALE, District Judge (dissenting in part).

I concur in the majority opinion in all respects save one: I am constrained to dissent as to the conclusion of the majority to disallow any compensation to the conciliation commissioner except the nominal statutory fees. The District Judge appraised the value of the services of the conciliation commissioner and his appraisal is quoted in the majority opinion and characterized as a "just appraisal". Admittedly, a strict interpretation of Sections 75, subs. b, s (4), 11 U.S.C.A. § 203, subs. b, s (4), might well result in the disallowance of any amounts to the commissioner other than those expressly provided for therein, and it would appear that the courts have so construed these statutes. Rancho San Carlos Inc., v. Greene, 9 Cir., 93 F.2d 338; In re Shindler, D.C.E.D. Wash., 38 F.Supp. 1021; In re Hargrove, 5 Cir., 96 F.2d 168. However, it is significant that in none of these cases was the court dealing with an estate which was more than adequate to pay all the claims in full, hence any additional fees allowed to the conciliation commissioners would have been at the expense of the creditors or the insolvent debtor. In the instant case, however, the allowance of these fees merely results in a reduction in the amount of surplus which will ultimately be turned over to the solvent debtor whose actions during this extended litigation were largely responsible for the additional services rendered and for whose benefit they were principally designed.

It was not within the original contemplation of Congress that a solvent estate would be settled in the bankruptcy court, and no provision was made in the statute for the disposition of a surplus. Nevertheless, in the rare cases in which a surplus remained after the payment of the claims that had been proved, it was distributed to the bankrupt. In re Silk, 2 Cir., 55 F.2d 917; Burton Coal Co. v. Franklin Coal Co., 8 Cir., 67 F.2d 796. It was not until 1938 that it was provided by an amendment to Section 57, sub. n of the Act, 11 U.S.C.A. § 93, sub. n, that not only claims which had been allowed, but also claims which had not been filed in time, should be allowed out of the surplus if filed within such time as the court might fix. Johnson v. Norris, 5 Cir., 190 F. 459, 462; Hammer v. Tuffey, 2 Cir., 145 F.2d 447, 450.

Where a surplus exists, the reasons underlying the limitations on the amounts allowable to a conciliation commissioner lose their force. The sections dealing with the compensation of the commissioner are obviously designed to keep the cost of the proceeding to a minimum so as not to further burden the hard-pressed farmer or to diminish the assets which he does have at the expense of his creditors who normally receive less than the amount of their claims. Clearly, creditors who have been paid in full are not in any way affected regardless of what disposition is made of the funds in excess of the amount of their claims. Nor can it be seriously argued that Congress in its desire to relieve harassed farmers intended to give to a farmer-debtor who subsequently is found to be solvent the benefit of the extensive services of a conciliation commissioner for seven years at no appreciable cost.

I do not think that in this case the statute should be so construed as to deprive this conciliation commissioner of compensation which he has so justly earned, nor do I believe that such a construction is required. I would affirm the District Court's award of compensation to the conciliation commissioner.