In the Matter of **MODERN WAREHOUSE, INC.,** Debtor.

**UNITED MISSOURI BANK OF KANSAS CITY, N.A.,** Plaintiff,

v.

Arthur B. **FEDERMAN,** Trustee in Bankruptcy, Defendant.

**Bankruptcy No. 83–01686–1–3–11. Adv. No. 86–0400–1–3.**

United States Bankruptcy Court, W.D. Missouri, W.D.

March 17, 1987.

Norman E. Fretwell, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for plaintiff.

Arthur B. Federman, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., Kansas City, Mo., for defendant.

MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING FINAL JUDGMENT ALLOWING PLAINTIFF A SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM AGAINST THE GENERAL FUNDS OF THE ESTATE IN THE SUM OF $34,986.08

DENNIS J. STEWART, Chief Judge.

This is an action brought by a secured creditor against a trustee in bankruptcy to recover from the assets of a bankruptcy estate the loss suffered by the secured creditor due to depreciation of its collateral while the automatic stay was in effect. The plaintiff claims this loss pursuant to § 507(b) of the Bankruptcy Code, which provides that:

"If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under § 362 of this title, from the use, sale, or lease of such property, under § 363 of this title, or from the granting of a lien under § 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection."

Pursuant to the orders of this court, the action came before it for trial on November

21, 1986, at which time the parties submitted to the court a written stipulation of facts as the basis for the court's decision. A copy of that stipulation of facts is attached hereto and incorporated herein by reference as the findings of fact required by Rule 7052 of the Bankruptcy Procedure. Briefly summarized, the relevant facts are that the automatic stay went into effect on June 24, 1983, when the voluntary petition was filed; that on the same date the debtor filed a motion for authority to use the plaintiff's cash collateral; that a hearing was held on that motion by former Bankruptcy Judge Frank P. Barker, Jr., on June 24 and 27, 1983, at which the debtor's indebtedness to the plaintiff was demonstrated to be $1.4 million; that the United Missouri Bank presented evidence at that hearing to the effect the value of its collateral was $1 million; that the debtor offered evidence in the same hearing to the effect that the collateral had a value of about $3 million; that Judge Barker wholly accepted the debtor's evidence of value and accordingly found the plaintiff to be adequately protected by the "equity cushion" which was found to exist between the $3 million value of collateral and the $1.4 million shown to be the balance due; that Judge Barker nevertheless conditioned denial of relief from the automatic stay on the debtor's maintaining accounts receivable at $1.4 million throughout the preconfirmation period (not more that $350,000 of which could be more than 90 days old) and on the payment of interest on a weekly basis; that this order was modified to require the maintenance of higher levels of inventory when plaintiff subordinated its security interest so that an infusion of cash in the amount of $250,000 could be accomplished in September 1983; that the debtor made weekly interest payments until July 1985 and maintained a $1.4 million level of all collateral (accounts receivable combined with other collateral) during the chapter 11 proceedings; that, on January 4, 1985, the chapter 11 proceedings were converted to chapter 7 proceedings after the debtor was unable to have any plan of reorganization confirmed; that "[p]roceeds attributable to the liquidation of United Missouri Bank's collateral in the amount of $345,000, after payment of operating and administrative expenses, were paid to United Missouri Bank pursuant to Court's order"; that "[t]he trustee still holds the amount of $13,832.41 as proceeds of United Missouri Bank's collateral"; that "[a]pplying all liquidation proceeds to principal, United Missouri Bank's deficiency respecting debtor's obligations totals approximately $1 million on principal alone"; and that "[t]he trustee has also collected the amount of $76,165.00 as a result of various preference actions."

### Conclusions of Law

The decisional authority which exists hold that, under section 507(b), *supra,* the secured creditor may recover as a superpriority expense of administration, the difference between the value of its collateral at the inception of the case and the value which is ultimately conferred on it upon ultimate liquidation. *In re Becker,* 51 B.R. 975, 980 (Bkrtcy.D.Minn.1985) ("[The secured creditor] is entitled to a superpriorty expense for its proved, actual loss due to failure of the adequate protection provided ..."); *In re Callister,* 15 B.R. 521, 526 (Bkrtcy.D.Utah 1981) ("Indeed, commentators appear to equate inadequate protection with allowability under § 503(b).")[1] The plaintiff United Missouri Bank accordingly contends that its actual loss is the $1 million difference between the $1.4 million value of its interest in collateral at the commencement of the case and the $358,000 for which the collateral was ultimately liquidated.[2] The plaintiff therefore accordingly claims all of the approximately $89,-

---

**1.** See also *In re Mutschler,* 45 B.R. 494, 496 (Bkrtcy.D.N.D.1984) ("Section § 507(b) simply provides that where adequate protection has been extended to a secured creditor and later proves to be inadequate, the creditor then becomes entitled to a superpriority administrative expense claim to the extent that the preferred adequate protection is insufficient.")

**2.** According to the stipulation of facts on which this case was submitted for decision, $345,000 was realized on liquidation of the collateral and the trustee now holds $13,832.41 attributable to the plaintiff's security interest. The total is $358,832.41.

000 which the trustee has on hand on the bases that its "proved, actual loss" greatly exceeds that sum.[3] The defendant trustee in bankruptcy contends that the loss was suffered after the United Missouri Bank had been granted relief from the automatic stay and had conducted the liquidation sale and that, therefore, its loss is attributable to its own handling of the sale process.[4] He further contends that the facts stipulated do not satisfactorily demonstrate that the cause of the plaintiff's loss was the automatic stay—that the loss may as well be attributed to market fluctuations or the debtor's inability to maintain the collateral in the required quantities.

■ The concept of adequate protection, however, has as its principal function the ensuring of a secured creditor's collateral from diminution during the preconfirmation period. See, e.g., *In re Aegean Fare, Inc.*, 34 B.R. 965, 968–969 (Bkrtcy.D.Mass. 1983) ("Adequate protection furnished to a creditor pursuant to § 361 is intended to assume the maintenance, and thus recoverability of the lien value in the interim period between the filing of the petition and the acceptance of a plan of reorganization.") As of the date of confirmation, or other effective date of a chapter 11 plan, the debtor must pay the secured creditor the value of its collateral.[5] And adequate protection, accordingly, is to accord the "indubitable equivalent" of any meantime reduction in value. "The purpose of [adequate protection] is to provide the protected entity with a means of realizing the value of the original property, if it should decline during the case ..." House Report No. 95–595, 95th Cong., 1st Sess. (1977)

338–40, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6294–6297. It is true that the debtor becomes responsible to pay under the plan any amount of pre-confirmation depreciation which is due to its misconduct.[6] But diminution for almost any other imaginable cause must, in contemplation of the purpose of adequate protection to ensure against it, be attributed to the automatic stay within the meaning of § 507(b), *supra*. This court therefore rejects the trustee's assertion that the stipulation of facts is insufficient to demonstrate that the "proved, actual loss" is attributable to the automatic stay.

But what is the "proved, actual loss"? Plaintiff, as observed above, contends that it is *at least* the difference between the $1 million value which it contended its collateral to have as of the date of filing and the approximately $358,000 for which that collateral was liquidated. It is clear from the briefs of the parties, however, that the values evidenced in the hearing of June 24 and 27, 1983, were of "going concern" or "market value." The plaintiff, in its trial brief, indicates that the only way that the values evidenced in the former hearing before Judge Barker can be distinguished from "going concern" or "market value" is that the amount produced on liquidation was only 17% of the amount found by Judge Barker to be the value of the collateral and that that figure is "far less than is usually realized from liquidation of similar assets." But the fact that the formerly-evidenced values were so much higher than the liquidated value seems to this court to support a conclusion that the formerly-evidenced values were "going concern" or

---

3. The trustee is stipulated to have on hand $76,-165.00 collected in preference actions and the $13,832.41 referred to in note 2, *supra*.

4. The plaintiff rejoins that it was the trustee himself who conducted the liquidation sale.

5. If the payment, as is the usual case, is extended over a period of time, interest must be paid to compensate for the delay in payment, so that the value received is that which is due as of the "effective date of the plan." § 1129(a)(7)(A)(ii) of the Bankruptcy Code.

6. See 3 Collier on Bankruptcy ¶ 506.04, p. 506–31 (15th ed. 1986), to the following effect: "[I]f

the valuation is to determine the amount of a secured claim for purposes of a chapter 11 or 13 plan, the value should be determined as of, or close to, the effective date of the plan." See also *In re Fulcher*, 15 B.R. 446, 448 (Bkrtcy.D.Kan. 1981) ("Absent a showing of bad faith by the debtor, including but not limited to destruction, misuse of the property or unreasonable delay in proposing a feasible plan, the collateral should be valued as of the day the plan is confirmed, which is the effective date of the plan, unless an effective date is otherwise provided for by the plan.")

"market values," which are nearly always significantly higher than liquidated values.

 And, just as clearly, in the context of § 507(b), *supra*, the value which is to be protected is "liquidation" value. See, e.g., *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir.1984) ("We hold that [an undersecured creditor] is entitled to compensation for the delay in enforcing its rights during the interim between the petition and confirmation of the plan ... monthly interest payments at the market rate on the liquidation value of the collateral ... is one method of providing adequate protection ..."). This protection is accorded on the theory that the secured creditor should be granted the same value as if he had the collateral in his hands to liquidate as of the date of commencement of the proceeding. See, e.g., *Matter of Johnston*, 44 B.R. 667, 669 (Bkrtcy.W.D. Mo.1984) to the following effect:

> "Thus, when, as in chapter 13 proceedings, the interest bearing value of the property itself is kept in the estate, it appears proper to award postbankruptcy interest at the market or legal rate to compensate the creditor for the loss of the interest potential."

See also *Matter of Coburn*, 36 B.R. 550, 551 (Bkrtcy.W.D.Mo.1983). Two interests are accordingly protected by the concept: that against delay in liquidation, an interest which answers to the measure of interest at the market rate on the "liquidation" value of the collateral, *In re American Mariner Industries, Inc., supra*, at 435, and that against reduction of the liquidation value finally realized. "The first method of adequate protection is ... cash payments by the estate, to the extent of a decrease in value of the opposing party's interest in the property involved." H.R. No. 95–595, 95th Cong. 1st Sess. (1977) 338–40, U.S.Code Cong. & Admin.News 1978, p. 5787. And the most in value which can be accorded, when liquidation is the ultimate event which must be contemplated[7], as is necessarily the case with respect to § 507(b), *supra*, and preconfirmation adequate protection[8] is liquidation value.[9]

 In this action, there is no stipulation of fact or of evidence which demonstrates what the liquidation value was as of the date of commencement of these proceedings. There is no basis upon which the court may predicate a finding that it was any greater than the approximately $358,-000 for which it was finally liquidated.

It must be concluded, therefore, that the plaintiff has no "proved, actual loss" because of any reduction in the liquidation value which can be attributed to the automatic stay.

 As observed above, however, the law of adequate protection clearly contemplates that the undersecured creditor[10]—as the plaintiff is shown in retrospect to be[11]—be compensated for the distraint of

---

7. It is true that, under a plan of reorganization, where the debtor remains in business, the value of secured creditor's collateral should ordinarily be its "going concern" value. See 3 Collier on Bankruptcy ¶ 506.04, p. 506–31 (15th ed. 1986), to the following effect: "If retention and use by the debtor of the collateral is proposed, there is generally no reason to assume for purposes of valuation that the collateral would be disposed of on a 'forced sale' basis." But, § 507(b) necessarily comes into focus when reorganization has failed and the prospect is liquidation. At such time, the irreduceable minimum is the "amount such holder would so receive or retain if the debtor were liquidated under chaper 7 of this title." Section 1129(a)(7)(A)(ii) of the Bankruptcy Code. Thus, it is true that, as this court has previously pointed out, "the chapter 11 debtor's duty to pay is measured ... by what he would be required to pay in chapter 7 proceedings," *Matter of Alexander*, 48 B.R. 110, 115 (Bkrtcy.W. D.Mo.1985), but liquidation of property as a "going concern," in chapter 7 or otherwise, is different from liquidation of a non-going-concern.

8. The purpose of pre-confirmation adequate protection is to preserve liquidation value. *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir.1984).

9. Cf. note 7, *supra*.

10. The same principles would seem to apply to an oversecured creditor, but some decisions have restricted their application to unsecured creditors.

11. This court does not in any respect purport to undo or modify the decision of Judge Barker. Even if it was in reality an erroneous decision, which it seems in retrospect to be, this court

the property and its use prior to the time of liquidation. *In re American Mariner Industries, Inc., supra; Matter of Coburn, supra; Littleton v. Kincaid,* 179 F.2d 848 (4th Cir.1950). Under the law which has developed in this circuit, the period of distraint ordinarily dates from the date of the filing of the request for relief from the automatic stay. *In re Ahlers,* 794 F.2d 388, 395, n. 6 (8th Cir.1986). In this case, as noted above, the liquidation value of the collateral was $358,832.44. The request for relief from the stay was made in conjunction with the hearing on use of cash collateral of June 24 and 27, 1983. Distraint and use of the property by the debtor continued until the conversion to chapter 7 and appointment of a trustee on July 27, 1984.[12] The relevant interest rate is 9%.[13] The "proved, actual loss" is therefore $34,986.08.[14] This amount will be awarded by this court as a superpriority expense of administration against the general funds in the estate.[15]

Accordingly, it is hereby

ORDERED, ADJUDGED AND DECREED that plaintiff be, and it is hereby, allowed a superpriority expense of administration payable from the general funds of the estate in the sum of $34,986.08.

## APPENDIX

### JOINT STIPULATION OF FACT

Plaintiff United Missouri Bank of Kansas City, N.A. ("United Missouri Bank") and defendant Arthur Federman, Trustee, agree and stipulate to the following facts:

1. Debtor, Modern Warehouse, Inc. filed a voluntary bankruptcy petition on June 24, 1983.

2. As of the filing of the petition, United Missouri Bank held a first and valid security interest in all of debtor's assets, including inventory, accounts receivable, contract rights, general intangibles, instruments and equipment. Among the above collateral were promissory notes owed to debtor by an affiliated corporation known as Modern West. United Missouri Bank also had a security interest in certain shares of stock of Horizon Industries, Inc. and a lake house, both owned by William Kyte, debtor's principal shareholder, securing Kyte's guaranty of debtor's obligations to United Missouri Bank.

3. As of the filing of the petition, United Missouri Bank's debt totalled approximately $1.4 million in principal plus certain accrued interest.

4. United Missouri Bank did not consent to the use of cash collateral as defined in 11 U.S.C. § 363. Consequently, on June 24, 1983, debtor filed a motion seeking authority to use cash collateral.

5. A hearing was held before Judge Frank P. Barker on June 24 and 27, 1983, upon debtor's motion. Testimony was presented by both parties as to the valuation of United Missouri Bank's collateral. The testimony of United Missouri Bank's witnesses indicated that the total value of United Missouri Bank's collateral was approximately $1 million, while the testimony of debtor's witnesses indicated that the value of the collateral totaled approximately $3 million.

---

would be obliged to follow it under normal circumstances. See, e.g., *Matter of Plantation Restaurant of Houma, Inc.* 45 B.R. 229, 231 (Bkrtcy.W.D.Ark.1984) ("Under the majority version of the law ... the undersigned must regard himself as bound by the absolute terms of the order entered by Judge Barker ...") But the cases hold that, under § 507(b), the court must redetermine the question of adequate protection to determine whether it has "later prove[n] to be inadequate." *In re Mutschler,* 45 B.R. 494, 496 (Bkrtcy.D.N.D.1984). In light of these principles, the case cited and relied on by the trustee for the principle that the parties are bound by the first determination, *In re Severson,* 53 B.R. 8, 10 (Bkrtcy.D.Ore.1985), is an overly technical and stringent interpretation of the statutory scheme which would leave little, if any force and effect for § 507(b), *supra.*

12. After that, the non-beneficial custody by the trustee does not warrant any award of interest. See *Littleton v. Kincaid,* 179 F.2d 848 (4th Cir. 1950).

13. *Matter of Coburn,* 36 B.R. 550, 551 (Bkrtcy. W.D.Mo.1984).

14. Thirteen months of interest at 9% calculates to this amount.

15. See note 11, *supra.*

6. During the hearing and after the close of evidence and arguments of counsel, the Court found that United Missouri Bank's collateral was valued according to the following:

| Collateral of Debtor | | Collateral of Kyte | |
|---|---|---|---|
| Accounts Receivable | $800,000 | Horizon Stock) | |
| Inventory | 630,000 | | |
| Tax Refund | 34,000 | Lakehouse ) | $500,000 |
| Equipment | 314,000 | | |
| Modern West Notes | 312,000 | | |
| TOTAL | $2,090,000 | | |

The values found by the Court were substantially the same as debtor's testimony. Debtor's testimony as to the value of the Horizon stock was $450,000 to $495,000 and as to the equity in the lakehouse was $50,000.

The Court further ruled at the hearing that United Missouri Bank had a $500,000 equity cushion even without considering Kyte's personal collateral; that United Missouri Bank was adequately protected as of the hearing date; and that debtor was entitled to use cash collateral. The Court directed the parties to agree to an order to afford United Missouri Bank certain additional requested protections, including the payment of interest on a weekly basis, maintenance of inventory and accounts receivables values at a combined level of $1.4 million (of which no more than $350,000 could be in accounts receivable in excess of 90 days old), access to financial information and retention of a United Missouri Bank employee on debtor's premises. Only the items agreed to by the parties are set forth in the Court's order dated June 29, 1983 ("Cash Collateral Order").

7. In September 1983, debtor caused the infusion of an additional $250,000.00 in cash and inventory by requesting United Missouri Bank to subordinate its security interest in the Horizon stock to allow Kyte to pledge the stock to secure a personal loan from Republic Bank. The Republic Bank loan proceeds were loaned by Kyte to debtor for the purpose of purchasing inventory pursuant to Court order dated September 16, 1983 ("September 16 Order"). The September 16 Order amended the Cash Collateral Order, raising from $1.4 million the required minimum level for the aggregate of the accounts receivables, inventory, and cash of the Debtor to an amount equal to $1.4 million plus the amounts which Kyte actually loaned to the Debtor pursuant to the September 16 Order.

8. In June 1984, debtor exchanged a $50,000 payment on one Modern West promissory note for inventory valued at the same amount. The trustee has received less than $10,000 on the Modern West Notes.

9. Debtor was unable to confirm a plan of reorganization, and a trustee was appointed by the Court on July 27, 1984, after motion by United Missouri Bank.

10. The bankruptcy case was converted to Chapter 7 on January 4, 1985.

11. During the course of the reorganization, debtor generally made interest payments as required under the Cash Collateral Order until July 20, 1984, the date of the last interest payment made by debtor in the amount of $3,658.56.

12. Debtor's inventory and accounts receivable levels generally were maintained throughout the reorganization at a combined total of $1.4 million.

13. Debtor otherwise generally complied with the Cash Collateral Order.

14. United Missouri Bank filed a Motion For Relief From Stay on February 19, 1985, and was granted relief by Court order dated April 18, 1985.

15. Proceeds attributable to the liquidation of United Missouri Bank's collateral in the amount of $345,000.00, after payment of operating and administrative expenses, were paid to United Missouri Bank pursuant to Court's order. The trustee still holds the amount of $13,832.41 as proceeds of United Missouri Bank's collateral. Applying all liquidation proceeds to principal, United Missouri Bank's deficiency respecting debtor's obligations totals approximately $1 million in principal alone.

16. The trustee has also collected the amount of $76,165.00 as a result of various preference actions.

17. United Missouri Bank is entitled to disbursement by the trustee of the amount of $13,832.41, less expenses of the trustee,

which represents the remaining proceeds of United Missouri Bank's collateral.

18. The June, 1984 monthly operating report filed with the Court (the last monthly operating report filed prior to the trustee's appointment) reflects inventory of $688,703.00 and receivables of $886,715.00 of which $312,462.00 were over 90 days old. As of the date of the trustee's appointment, the equipment and Modern West Notes referred to ¶ 6 above were still held by the Debtor. The quality of Debtor's inventory was better in terms of salability at the time of the trustee's appointment than it was at the time the Chapter 11 proceeding was commenced.