# Richmond

## J. C. BYARS, AND OTHERS v. C. J. STONE AND S. T. GILMER, ADMINISTRATORS, ETC.

June 9, 1947.

Record No. 3192.

Present, Holt, C. J., and Hudgins, Browning, Gregory, Eggleston and Buchanan, JJ.

520

The opinion states the case.

*E. W. Potts* and *Floyd H. Roberts*, for the appellants.

*Fred C. Parks* and *Donald T. Stant*, for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This suit was brought by the administrator of A. J. Lore (for whom the present appellee administrators were afterwards substituted) against some of the appellants and others, to enjoin a sale by the appellants' trustee of a house and lot near Bristol, upon which Lore's administrators claimed to have a prior lien. The additional object of the suit was to have the claim of Lore's estate established as superior to the claim of the appellants and to subject the property to the Lore debt.

J. C. Byars was not a defendant to the original and amended bills, but was made so by the final decree on his motion, and filed his answer. He is the husband of Mrs. Jane B. Byars, and the father-in-law of J. A. Caldwell, the other two appellants, and was the real defendant in the case.

When the name Byars is used herein, he is referred to unless otherwise indicated.

In a written opinion, after carefully analyzing the evidence, the trial court held with the contention of Lore's administrators, and entered the decree appealed from, granting to the complainants a judgment against Mr. and Mrs. Byars for the amount of their debt, and against them and J. A. Caldwell for costs. In accordance with a suggestion, in the opinion, the parties agreed that a sale previously made of the property by Byars to Mrs. Preston should be carried out. Mrs. Preston had paid Byars $1,950 on the purchase before the suit was brought, and afterwards she paid the balance to the court's commissioners who conveyed the property to her. The decree directed that the amount in the commissioners' hands, $3,287.50, after certain deductions, be applied on the complainants' judgment.

The conflicting claims arose out of these involved occurrences:

On November 5, 1928, F. G. Leonard and wife executed a deed of trust on said lot to James L. Davis, trustee, to secure a note for $500, due May 5, 1929, and four notes for $1,000 each, due November 5, 1931, with interest, payable semi-annually. A. J. Lore was the owner of these notes and they were in his possession at his death on July 29, 1944.

The deed of trust provided that if any note was not paid at maturity, the whole indebtedness would become due. The $500 note was not paid, and on September 12, 1929, Davis, trustee, sold the property for $4,865 and executed a deed therefor to Mrs. Willie Pierce Gannaway. This deed was dated September 12, 1929, but not recorded until March 12, 1931. It recited that Mrs. Gannaway had paid the purchase price in full. In fact, she paid only $365 and executed and delivered to Davis a negotiable note for $4,500.

This note was dated April 2, 1930, nearly six months after the sale, was payable April 2, 1932, to bearer, with interest payable semi-annually, evidenced by four coupons

attached. To secure payment of this note, Mrs. Gannaway and her husband executed a deed of trust, also to Davis as trustee, dated April 2, 1930, and recorded June 6, 1930.

J. C. Byars, in 1944, under circumstances hereinafter related, bought Mrs. Gannaway's equity of redemption in the property for $10, and had it conveyed to his wife, and he also bought the Gannaway $4,500 note from Mrs. Cochran, who had got it from Davis.

Davis, the trustee, was an attorney in Bristol and engaged extensively in lending money for others. About the time of the Gannaway transaction he had become very much involved, and wrote to Lore in 1941 that he had nothing left—not even the necessities of life. He died about the time this suit was instituted. It is not shown whether he lent Lore's money to Leonard, or transferred Leonard's notes to Lore after they were made. On December 27, 1928, Davis wrote to Lore enclosing an insurance policy on the property, which he said he did not have when he handed him the other papers in connection with the loan the day before. Leonard never paid anything on the principal or interest of these notes.

Complainants contended that Lore did not authorize the sale by Davis, trustee, to Mrs. Gannaway, and never knew anything about it; but there was evidence that he was present when the sale was made by Davis, and the trial court correctly held that it was a valid sale, binding on Lore and his estate.

Davis, the trustee, did not turn over to Lore the Gannaway note, but kept it himself, and apparently also the cash payment and the papers relating to the Gannaway sale. Mrs. Gannaway moved into the property in the summer of 1930, soon after the date of her note, but several months after the date of her deed. She lived in the property about seven years and moved out in the fall of 1937. During that time she paid to Davis $30 a month. On moving out, Mrs. Gannaway apparently abandoned the property and paid nothing more.

From that time Lore dealt with the property as his own.

From 1934 to 1944 he paid the taxes on the property on tax tickets made out against Mrs. Gannaway. He kept the property insured from 1937 through 1945. About 1938 he rented the property to Paul Maine, who stayed in it until the fall of 1943 and paid rent to Lore. During that tenancy, Lore installed a new furnace, repaired the roof, and made other expenditures on the property.

In the 1941 letter mentioned above, Davis referred to the property as being owned by Lore. In 1942, J. D. Baumgardner (an attorney of Bristol, Tennessee, who was a friend of Lore's and helped him with his affairs, and in whose office Lore kept his papers and was a frequent visitor), advised Lore to get Davis' resignation as trustee under the Leonard deed of trust and have that deed of trust foreclosed. Baumgardner apparently did not know of the Gannaway sale and did not think that Lore did. Baumgardner prepared a resignation and Davis executed it on August 27, 1942, acknowledged it, and it was recorded September 11, 1942.

That instrument recites that Davis had moved away from Washington county and for that and other reasons was no longer able to act as trustee. About that time Lore was advised by Mr. Parks, an attorney at Abingdon, who examined the records in 1943 when Lore was trying to sell the property to Cox, that it was better to proceed by chancery suit, and Baumgardner thought that would have been done except that Lore was "too close" to go into court over something he felt he owned absolutely. He said he had frequently heard Lore try to sell the property, and it was impossible to convince him he did not own it.

In the meantime, Davis, trustee, had transferred the Gannaway note to Mrs. Janie A. Cochran, at a date much in controversy and under circumstances later to be mentioned. In June, 1944, Lore became sick, was brought to a Bristol hospital in July, and died there July 29, 1944. About a week before he died, Baumgardner had a conference with Mrs. Cochran in his office for the purpose of buying the note for Lore. At her suggestion they went to the office

of J. A. Caldwell, attorney and son-in-law of Byars, as mentioned, where the circumstances with respect to the property were fully discussed, and Mrs. Cochran offered to take $1,000 for the note, which Caldwell advised her he thought was a fair price. Baumgardner said he would see Lore at once about it, and went to the hospital for that purpose, but Lore was then too sick to discuss it, and died before anything further was done about it.

In May, 1944, the month before Lore got sick, Byars went to see Lore in Baumgardner's office about selling the property to Underwood. Baumgardner came in and found them there. Lore told Baumgardner that he had employed Byars to sell the property, or had listed it with him, and showed Baumgardner a contract Byars had prepared and asked Baumgardner whether it was all right. This contract was dated May 4, 1944, was executed by Lore as vendor, Underwood as vendee and Byars as attorney and agent, and is filed as an original exhibit. By it Lore agreed to sell the property to Underwood for $5,000, of which $500 was paid to Byars, one-half was to be paid in cash when the title was cleared and the balance at the rate of $50 a month. Its other terms will be discussed later on.

Byars gave Lore $50 of the $500 deposit, by check dated May 5, 1944. Byars claimed that a few days after this contract was signed, Underwood came to his office and demanded his deposit back because he said Lore had no title and could not give him a deed, and that he returned the deposit to Underwood. He then went to Abingdon and examined the title. He testified that upon his examination, which he thought was after the return of Underwood's deposit, he concluded that Underwood was right about Lore having no title; that he so advised Lore and then proceeded to undertake to clear up the title. It was in this connection that he took the deed from Mrs. Gannaway and subsequently acquired the Gannaway note.

The trial court held that he took the Gannaway title and note impressed with a trust in favor of Lore, whose attorney and agent he was at the time, and in effect decreed

that Lore's estate, and not Byars, was entitled to the money arising from the sale of the property to Mrs. Preston. This is the holding to which appellants assign error.

In its opinion the trial court held that Mrs. Cochran was a *bona fide* purchaser for value of the Gannaway note, without notice of the breach of trust committed by Davis, trustee, in transferring it to her instead of delivering it to Lore, who was its real owner. Appellees assign cross-error to this holding, but waive it if the first mentioned holding is affirmed.

At best there is serious doubt on this point. Since Davis had no title to the note and no right to negotiate it, the burden was on Byars to prove that Mrs. Cochran acquired it before maturity (Code, 1942, Michie, secs. 5614, 5621).

Only Mrs. Cochran testified on the subject, and she said she did not know when she bought it, but that it was while the Gannaways were living in the house. This would mean any time between the summer of 1930 and the fall of 1937. The note became due April 2, 1932. Baumgardner and another witness testified that Mrs. Cochran said in the conference in Baumgardner's office, referred to above, that she got it in 1938, or about that time. Mrs. Gannaway's daughter testified that Mrs. Cochran first mentioned having the note to her mother in 1937. These and other circumstances would seem to require the conclusion that Byars has not carried the burden on the question. We do not expressly so decide, however, because we think the court correctly held that the property and its proceeds were impressed with a trust in the hands of Byars.

The trial court said: "There is a rather clear inference that Mr. Byars procured the quit-claim deed to his wife while he was examining the records as agent and attorney for Lore. If this is not exactly so, the sequence of events is so close that there was no fair interval during which he had an opportunity to make a *bona fide* severance of his fiduciary relationship with Lore, and thereafter proceed to acquire for his nominee an interest adverse to the interest of Lore."

The conclusion rests on more than an inference. By the Underwood contract of May 4, 1944, Byars identifies himself as attorney and agent. This contract provided, among other things, that examination of the title was to be at the cost of the agent (Byars); that there was to be no forfeiture of the $500 cash deposit made by Underwood pending clearance of the title, and that a reasonable time was to be allowed by Lore to correct any defects reported by the title examiner.

It further provided that Byars was to have no commission, but Lore was to pay him an attorney's fee, which had been agreed upon "to cover all costs incident to the sale, except examination and perfection of title."

When Lore showed this contract to Baumgardner, as mentioned above, the latter inserted a clause that if Lore was unable to deliver a satisfactory title, then "the $500.00 deposit left by vendee with his agent" was to be refunded to the vendee, but Lore assumed no liability therefor. Byars argues that this addition shows that he was the agent of Underwood, not the agent of Lore. Baumgardner testified that "knowing the situation with reference to the titles had been disclosed, for Mr. Lore's protection I suggested this paragraph and wrote it in." The $500 had been paid to Byars, not to Lore, and the only effect of that provision was to make Byars the agent of Underwood so far as that payment was concerned. Otherwise, the contract is clearly one creating Byars the attorney and agent of Lore. Moreover, under the terms of the contract, it was the duty of Byars either to examine the title or to pay for having it done.

Byars does not claim that Lore authorized or consented to his giving back Underwood's deposit. That act was clearly against the provision of the contract.

Byars testified that this was what he did next:

"After the sale to Underwood and he told me that Lore's title was—that Lore had no title which was the reason he assigned for demanding his deposit back, I went to Abingdon and spent several days examining the title to the prop-

erty. * * I think that was after I had returned his deposit. * * After I had examined the title I came to the conclusion that Underwood was right and that Lore had no title to the property and therefore was not in position to sell it. This conclusion was predicated on the records at Abingdon. I so advised Mr. Lore and proceeded to undertake to clear up the title. That was on or about May the 10th, I think it was."

It was necessarily in the course of this examination that he prepared and had executed the Gannaway deed, which was dated, acknowledged and recorded on the 9th day of May, 1944. With reference to this, he said that after he examined the title, he went to see Mrs. Gannaway's daughter in the courthouse, and after agreeing with her he went to another office in the courthouse, prepared the deed and paid the daughter $10 in cash when she delivered it to him. He said he did not see Mrs. Gannaway before this deed was executed, but that Miss Gannaway told him her mother had given up the property. Miss Gannaway testified that he was at the hospital twice to see her mother and they stated to him then they did not consider they had any interest in the property.

He was asked why he was clearing up the title and he said, "I felt that it was salable if and when the title was cleared up, so I proceeded to purchase the same, or rather, I did so for my wife, Jane B. Byars."

Again he was asked how soon after May 4 he advised Lore he had no title, and he replied that it was a day or two. "I went immediately to Abingdon to look into it and on my return met Mr. Lore and told him that so far as the records in Abingdon disclosed he had no title to the property." He said nothing to Lore, so far as his evidence shows, about the deed that he had already procured and had recorded in his work of clearing up the title.

He said that a few days after he had examined the records he went to Wytheville to see Davis, the trustee, and talked to him about the matter, and was told by him that Mrs. Cochran was the holder of the note; and that some

months afterwards he proceeded to clear up the title as best he could; that he decided it was necessary to take over and foreclose under the Cochran note, and accordingly had Judge Caldwell, his son-in-law, to buy it, and supplied him with $1,000 to do so. Her assignment of the note to Caldwell is dated October 27, 1944. This was only about three months after Caldwell was present and heard Mrs. Cochran tell Baumgardner she would sell it to Lore for that price. It was hardly possible that Caldwell did not tell him about that incident.

All these things that he did for himself, he could have done for Lore, his client and principal. Not only that, but they were things he was obligated to do under his written contract with Lore, or else to acquaint Lore with the facts and give him an opportunity to acquire these rights. And even beyond that, they were things that his relationship with Lore of attorney and client required him to disclose. He does not claim to have done that. On the contrary, he said he felt he was under no further obligation to Lore, and proceeded to deal with the situation for his own benefit. When he did so, what he gained was impressed with a trust for the benefit of Lore or his estate.

An attorney occupies toward his client a high position of trust and confidence, and in his relations with his client it is his duty to exercise and maintain the utmost good faith, integrity, fairness and fidelity. This relationship precludes the attorney from having any personal interest antagonistic to those of his client, or from obtaining any personal advantage out of the relationship, without the knowledge or consent of his client. 7 C. J. S., Attorney and Client, sec. 125, p. 957.

He cannot, without his client's consent, acquire and hold, otherwise than in trust, any adverse interest or title in the subject matter of his employment. Id., sec. 126, p. 960. This inhibition may continue even after the relationship has terminated, to prevent a breach of confidence, or an unfair advantage from being taken by the use of knowledge acquired in the relationship. Id., p. 963.

■ Similar principles apply to the agency relationship, and in the absence of the principal's knowledge or consent, "an agent, whose duty it is to perfect the principal's title, or who in the performance of his duty discovers a defect in his principal's title to the property, will not be permitted to purchase for himself any adverse right or title thereto which may be outstanding;" and he will be regarded as holding such right or title as trustee for his principal. 3 C. J. S., Agency, sec. 140, p. 13.

■ The rule is " 'of universal application to all persons coming within its principle, which is, that no party can be permitted to purchase an interest *where he has a duty to perform which is inconsistent with the character of* a purchaser.' 2 Rob. Pr. p. 317." *Broaddus* v. *Broaddus*, 144 Va. 727, 743, 130 S. E. 794.

■ "It is well settled that where one person sustains a fiduciary relation to another he can not acquire an interest in the subject matter of the relationship adverse to such other party. If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom." *Horne* v. *Holley*, 167 Va. 234, 240, 188 S. E. 169.

■ In the same opinion is this statement (167 Va. 241): " 'It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. * * * This is a rule of common sense and honesty as well as of law.' 2 Am. Jur. (Agency), section 252, page 203. *Ferguson* v. *Gooch*, 94 Va. 1, 8, 26 S. E. 397, 40 L. R. A. 234."

■ The appellants set up the defense of limitation and laches in their answers. Neither defense is available to them.

The deeds of trust are not barred and no laches occurred in this suit brought in January, 1945, to establish a trust based on transactions which occurred in 1944.

There was no error in decreeing costs against J. A. Caldwell. He was a defendant to the bills, filed his demurrer and answer, and joined with the other defendants in their defense.

The recovery against Mr. and Mrs. Byars, however, should not have been for the balance due on the debt of Leonard to Lore. What the complainants are entitled to, as decided, is to have the property acquired by Byars impressed with a trust. They agreed to the sale to Mrs. Preston. The proceeds of that sale are in the hands of Byars and the court's commissioners. The complainants are entitled to have those sums, after the deductions fixed by the court, applied to their debt. After the application of the net amount in the hands of the commissioners, the complainants should have judgment for the balance in the hands of Byars from the sale, after the credits allowed by the court, but not for any balance then remaining due on their claim.

The decree is modified to this extent, and, as so modified, is

*Affirmed.*