# CIRCUIT COURT OF THE CITY OF RICHMOND

In re Trust
under the Will of
John Moseley Southall,
deceased

June 7, 1999

Case No. 98-415

BY JUDGE RANDALL G. JOHNSON

This matter is before the court on the commissioner of account's refusal to approve an accounting. Before setting out the particular problems cited by the commissioner, a history of the proceedings is necessary.

John Moseley Southall died on March 10, 1969. His will established a trust for the benefit of Mary Scott Southall, his wife. The will gave the trustee discretion to "pay such part or all of the income or corpus of my Trust Estate to my said wife as and at such times as he may deem proper so long as my said wife shall live." At his wife's death, the corpus and accumulated income of the trust was to be paid in equal shares to the Southall's two daughters, Mary Southall Lane and Jane Moseley Southall Bowles, or, if either daughter predeceased his wife, to the issue of such deceased daughter. The will nominated Aubrey R. Bowles, III, who was and is the husband of Jane Moseley Southall and who is also a practicing attorney, as executor and trustee.

On April 1, 1969, Bowles qualified as executor of his father-in-law's estate and as trustee of the testamentary trust. The inventory filed in May 1969 shows an estate valued at approximately $89,000, almost all of which became property of the trust. While regular accountings for the trust were filed and approved from 1969 to 1981, no accountings were filed from 1982 through 1997. According to Bowles, this was due to the fact that his pre-1982 accountings were prepared by his law partner and when he and his partner

stopped practicing together, the stress of trying to keep his practice going prevented him from filing accountings as they became due. He says that he asked the then commissioner of accounts to be relieved of the requirement of filing annual accountings and that his request was granted, the commissioner telling Bowles to file a final accounting at Mrs. Southall's, the beneficiary's, death.

As noted earlier, Bowles is married to Jane Southall Bowles, one of the Southalls' two daughters and one of the persons to whom the trust proceeds were to be paid at Mary Scott Southall's death. In October 1997, John W. Lane, the husband of Mary Southall Lane, the Southalls' other daughter, visited the present commissioner of accounts inquiring about Bowles' failure to file accountings since 1981 and informing the commissioner of what Lane felt were questionable transactions involving the trust. Based on that meeting, the present commissioner researched his predecessor's files and found the asset file and index card for the trust. He then directed Bowles to bring his accountings up to date, issuing to Bowles a "Final Request for Account" on October 28, 1997.

Mary Scott Southall died on December 5, 1997. Later that month or early in January 1998 (the record is not clear), Bowles submitted to the commissioner accountings for each calendar year from 1982 through 1996, and an accounting for the period January 1 through December 19, 1997. On January 16, 1998, in accordance with Va. Code §§ 26-31 and 26-32, the commissioner filed the accountings with the clerk's office of this court. In his filing, the commissioner noted several "exceptions" to each of the accountings filed, with many of the "exceptions" being repeated from year to year. Specifically, the commissioner noted the following:

1. That Bowles had made loans from the trust estate to himself or to his law firm which, as of December 19, 1997, totaled $61,900;

2. That there was no itemization of the individual firearms which were part of an antique gun collection belonging to the estate;

3. That Bowles had not submitted documentation to verify shares of stock, dividends, and other transactions, such as stock splits, related to stocks, and in some cases, no value for the stocks themselves;

4. That Bowles had not submitted bank statements to verify bank and savings and loan balances;

5. That a loan to a "Hancock-Wirt-Caskie House" in the amount of $28,000 was not listed as an asset of the trust estate and was not secured by a deed of trust. The commissioner also had a question about whether interest was charged on the loan, but noted that a later entry probably, but not clearly, indicates that it was;

6. That trust funds were used to restore a Southall family portrait without sufficient documentation to show proper authorization or the location of the portrait;

7. That vouchers verifying tax payments were not submitted; and

8. That a check in the amount of $2,395.56 was given to the "Southall Trust" with no explanation of what the check was for or what the "Southall Trust" is.

The commissioner stated in his report that these "exceptions" "will be resolved in the Final Account," Mary Scott Southall, as already noted, having died on December 5, 1997.

By letter to the court dated February 6, 1998, which was received and marked "filed" by the clerk's office on February 9, 1998, Bowles submitted a copy of a letter he had written to the Virginia State Bar in response to a letter written to the Bar by the commissioner.[1] Bowles asked that his letter to the bar be filed "as my objection to the interim account heretofore filed by" the commissioner of accounts. No hearing, however, was ever requested on the commissioner's "exceptions" or Bowles' "objections."

In a letter dated July 21, 1998, the commissioner informed Bowles that he had received "various inquiries" from Mary Southall Lane, Bowles' sister-in-law, about the loans made to Bowles and his law firm from the trust estate. The commissioner also reminded Bowles of Bowles' statement to the Virginia State Bar, which was contained in Bowles' letter to the Bar previously referred to, that he would repay those loans "upon demand, otherwise, at [Mary Scott Southall's] death or promptly thereafter, which has been done," and that interest at the rate of eight percent would also be paid on the loans. The commissioner asked that Bowles provide confirmation that the loans had been repaid and that, pursuant to Va. Code § 26-17.5(C), he was requiring Bowles to file an accounting bringing all matters current through June 30, 1998.[2]

---

[1] The record is not clear on whether a bar complaint was filed by the commissioner or Bowles' brother-in-law or someone else about Bowles' handling of the trust. The only documents related to a possible complaint are what are attached to letters and pleadings filed in court, and no mention of a bar complaint was made in the commissioner's report. In any event, the fact of such a filing is not relevant to this proceeding.

[2] Virginia Code § 26-17.5(C) provides that notwithstanding the normal requirement that accountings be filed sixteen months after qualification and once a year thereafter, "the commissioner of accounts or the court may require the personal representative to file a first or subsequent account at an earlier date upon reasonable cause shown."

On July 28, 1998, after Bowles had apparently provided the commissioner with an itemized list of the guns making up the trust's antique gun collection, the lack of such itemization being one of the items questioned by the commissioner, the commissioner wrote to Bowles and told him that Bowles' sister-in-law was contending that the gun collection described by Bowles was not the same as the gun collection shown on the 1981 accounting, the last accounting approved before the sixteen-year accountings gap. The commissioner asked Bowles for "an accounting in detail as to all" of the gun transactions.

By letter dated August 3, 1998, Bowles gave the commissioner a history of transactions involving the gun collection. He stated that while the guns were different, the collection's value had increased from $11,500 to $21,150. He also stated that all of the loans to him and his firm had been repaid with interest. He concluded by saying "the Lanes will be coming to Richmond in early September to view the guns and a decision will then be made as to how to deal with them and, hopefully, the matter can then be concluded."

On September 8, 1998, the matter having not been concluded and the accounting requested in the commissioner's July 21 letter having not been submitted, the commissioner issued a summons requiring Bowles to submit an accounting within thirty days. When an accounting was still not filed, the commissioner sought a show cause order. Such an order was issued on October 22 and required Bowles to appear in court on November 16, 1998, to explain why the required accounting had not been filed. After a continuance of the November 16 hearing, which the commissioner requested to give Bowles a further opportunity to comply with his request, an accounting was submitted to the commissioner for the period December 20, 1997, to October 20, 1998. The commissioner, in turn, filed the accounting in court on December 21, 1998. As he had done previously, however, the commissioner included with the filing of "exceptions" to the accounting. The "exceptions" were:

1. That although the principal and interest on the loans to Bowles and his law firm had now been paid in full, the fact that the interest was paid all at once meant possible unfavorable tax consequences to the trust and/or the Southall daughters;

2. That the gun collection was still not properly accounted for; and

3. That "*all* other exceptions taken in prior accounts remain as open and unresolved." Emphasis in original.

By letter dated January 4, 1999, which the clerk's office received and marked "filed" on January 5, Bowles noted his "objection to the ... interim accounting heretofore filed by" the commissioner of accounts. The court then

set a hearing for April 5, 1999, at which the commissioner and Bowles stated their respective positions with regard to the accounting. It is in this posture that the case is before the court.

At this point, the court deems it appropriate to make a few general observations. First, although the commissioner and Bowles designated their respective filings by using terms not in strict compliance with relevant statutes, those filings are sufficient to put the matter properly before the court. Specifically, while the commissioner filed "exceptions" to Bowles' accountings and Bowles filed "objections" to the commissioner's "exceptions," the statutes do not seem to contemplate the use of those terms in that way. In this regard, Va. Code § 26-31 provides:

> Every account stated under this chapter ... shall be reported, with any matters specially stated deemed pertinent by the commissioner, or which may be required by any person interested to be so stated.

Virginia Code § 26-32 requires the court to examine exceptions to a commissioner's report after fifteen days of the report's filing. When read together, the two statutes make it reasonably clear that the commissioner does not file "exceptions" to the accounting. Instead, the commissioner files the accounting along with his or her report setting out any matters he or she deems pertinent, or which an interested person requires the commissioner to set out. The fiduciary or any other interested person then has fifteen days to file exceptions to the commissioner's report. In fact, Bowles' "objection" to the commissioner's January 1998 filing of the 1982-1997 accountings was filed outside of the fifteen days allowed for exceptions, and that is probably the reason no hearing was requested then. For the December 20, 1997, to October 20, 1998, accounting, the one now under consideration, the court will treat the commissioner's "exceptions" as the report required under § 26-31, and Bowles' "objections" as exceptions under § 26-33.

Next, the court notes with considerable concern the sixteen-year period during which no accountings were filed by the fiduciary. While Bowles stated that he had permission from the former commissioner of accounts not to file accountings during that period, the court knows of no law that allows such permission to be granted. The former commissioner is now deceased, and there is no way for the court to determine what really happened. That former commissioner served this court long and well, and it would be strange for him to have allowed a fiduciary to disregard legal requirements. The court must also assume that all fiduciaries know what their responsibilities are, and they

take tremendous risks when they fail to comply with those responsibilities, even if an informal agreement is reached with a commissioner.

The court also notes Bowles' concession that although he is a licensed attorney, he is not very knowledgeable in estate law. This undoubtedly explains many of the problems cited by the commissioner. It cannot, however, excuse his actions. Virginia's disciplinary rules applicable to lawyers expressly prohibit a lawyer from undertaking representation in matters outside his or her competence unless competent co-counsel is associated. D.R. 6-101.

On the other hand, the court cannot help but note that Bowles was handling an estate of a family member. Fiduciaries' duties and responsibilities are set by statute, and no distinction is made for estates of family members and estates of non-family members. Still, the court cannot ignore reality, and some consideration must, and will, be given to the particular circumstances present in this case, including the fact that for more than twenty-eight years, the trust beneficiary, Bowles' mother-in-law, was fully aware of the manner in which Bowles was handling the trust and, according to Bowles, approved all of his transactions. In light of the will's provision allowing Bowles to pay the beneficiary all or part of the income or corpus of the trust as Bowles "may deem proper," her acquiescence in his actions is significant. Also significant is the fact that no formal appearance has been made in this proceeding by Bowles' sister-in-law, one of only two present beneficiaries of the trust, in spite of notice to her. The only other present beneficiary of the estate is Bowles' wife, and she makes no complaint about any of Bowles' actions.

The court also cannot ignore the fact that Bowles has now been trustee of this trust for over thirty years and has never taken a commission for his services. At the standard rate of 5%, *see, e.g., Clare v. Grasty*, 213 Va. 165, 173, 191 S.E.2d 184 (1972); *Williams v. Bond*, 120 Va. 678, 686-687, 91 S.E.2d 627 (1917), Bowles could argue for a commission of well over $20,000, but seeks none. While this fact, like the fact of family relationship, does not excuse improper conduct, it is a factor in the court's decision.

With all of that having now been said, the court turns to the specific matters set out by the commissioner.

## 1. *Loans from the Trust to Bowles and his Firm*

It is well settled that a fiduciary can take no action adverse to his or her duty, and any transaction between a fiduciary and the estate is suspect. In fact, when a trustee "deals with himself in respect to the trust estate," such transaction is voidable by the trust beneficiary "at his election without giving any reason or alleging any fraud, or any advantage or inadequacy of price."

*Parsons v. Wysor*, 180 Va. 84, 95, 21 S.E.2d 753 (1942). *See also Creasy v. Henderson*, 210 Va. 744, 749, 173 S.E.2d 823 (1970); *Byars v. Stone*, 186 Va. 518, 530, 42 S.E.2d 847 (1947). In *Horne v. Holley*, 167 Va. 234, 188 S.E. 169 (1936), the Court said:

> It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto ... . This is a rule of common sense and honesty as well as of law.

167 Va. at 241, *quoting* 2 Am. Jur., *Agency*, § 252, p. 203.

The simple and unassailable logic of the foregoing rule, based on the agent's role as a fiduciary, something a trustee obviously is, is clear. If a fiduciary's credit worthiness is such as would lead a prudent lender other than the estate to make a loan to the fiduciary, then the loan could be, and should be, obtained from such other prudent lender. If the fiduciary's credit worthiness is such that a prudent lender other than the estate would not make such a loan, then the fiduciary has no business allowing the estate to make it. As noted above, a principal or trust beneficiary can void such a transaction without any showing of fraud, unfair advantage, or inadequacy of price. While the court is aware of no statutory or case law that absolutely forbids loans from a trust to a trustee, such transactions are plainly and simply wrong. If the loans made to Bowles had not already been repaid with interest, the court would not hesitate to order their immediate and complete repayment with interest now. Since repayment has occurred, there is no need for such an order.

The only issue remaining with regard to the loans is the fact that their repayment with all accrued interest has, according to the commissioner of accounts, exposed the trust beneficiaries to tax liabilities greater than would have been incurred had the interest been repaid over time. In fact, the court received a letter from the commissioner after the hearing on this matter stating that an additional income tax liability of $5,053 was incurred by Bowles' sister-in-law for 1998 that is attributable to Bowles' lump-sum repayment of interest. After receipt of that letter, however, the court received a letter from Bowles which, although again attempting to explain that the loans were not improper, stated that he had sent his sister-in-law his personal check for

$5,053 to reimburse her for the increased tax liability. In light of that payment and in light of the fact that the trust and the trust beneficiaries have suffered no other harm, no further sanction or order is now necessary. The court trusts, however, that it has made its feelings known to Bowles and to all other fiduciaries that transactions such as those in this case will be swiftly and completely set aside if requested by a beneficiary. They should be avoided.

## 2. *Gun Collection*

Fiduciaries are charged with keeping proper records so that all of their actions can be reviewed by the commissioner of accounts, the beneficiaries of, and all other persons interested in, such estates, and the court. Unless proper records are kept, there can be no assurance that a particular fiduciary has performed his or her job appropriately. Proper records were not kept in this case.

The court will not repeat what it has already said about Bowles' inexperience in handling trust estates. The fact is that in 1981, the last year for which annual accountings were timely submitted, Bowles listed an antique gun collection worth $11,500, and which consisted of four "complete cased sets of duelling pistols." When Bowles filed the past-due accountings for 1982 through 1997, eleven weapons were listed as making up the collection, none of which were any part of the duelling pistol sets shown on the 1981 accounting, and the value of the collection was listed at $17,900. In the last accounting, the same weapons are listed as were listed in the 1997 accounting, but the value is now set at $21,150.

In trying to explain his transactions regarding the gun collection, Bowles states that the duelling pistols that made up the original collection, including a fifth set that was sold before the 1981 accounting, were not what they had been represented to be when he first purchased them. This, according to him, was due to his inexperience in dealing with guns. When he found out that they were not as valuable as he had thought, he began going to gun shows and dealers and "trading up" until the collection is now worth the $21,150 shown on his latest accounting. He did not document his transactions over the years, so he now has nothing to show the commissioner or the court to reflect his trades. He argues, though, that since the collection has increased in value from $11,500 to $21,500, any shortcomings on his part have not harmed the trust. His argument cannot be totally accepted.

Virginia Code § 26-45.1(A) provides, in pertinent part:

[I]n acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary, whether individual or corporate, shall exercise the judgment of care, skill, prudence and diligence under the circumstances prevailing from time to time ... that a prudent person familiar with such matters and acting in his own behalf would exercise under the circumstances in order to accomplish the purposes set forth in the controlling document.

In light of his concession that he was inexperienced in gun collecting, it is hard to say that Bowles exercised that degree of skill and diligence that a prudent person would have exercised in managing his or her own affairs when he invested trust money in a gun collection. The court also notes that even at a very conservative rate of return of 5% — certainly what he could have earned in a fully-insured certificate of deposit — the $11,500 invested in the collection in 1970 would now be more than $47,000, so the fact that the collection is now worth $21,150 is far from impressive. Still, the court is not inclined to take any action against him.

Fiduciaries are required to exercise good judgment in their dealings with their estates. They are not required to exercise perfect judgment. In this case, the court has been presented with no evidence that an investment in a gun collection of the type involved here in 1970 was an imprudent or otherwise unreasonable business investment or that the increase in value of that investment, as "meager" as it is, is not a reasonable return on the specific investment made. Without such evidence, and even though a safer investment, in hindsight, would have been better, the court cannot hold that Bowles' investment was improper.

The court also finds that the lack of paperwork, although indicative of the general "sloppiness" of Bowles' performance, does not warrant any compensatory or punitive action against Bowles. The court is convinced that the failure of Bowles to keep proper records was the product of inexperience, or maybe even indifference. It was not intended for personal gain or to otherwise harm the trust estate. The former beneficiary of the trust was aware of his dealings and never made any complaint. The court will take no action now.

### 3. *Lack of Documentation*

Three of the problems cited by the commissioner can be dealt with together. They are lack of documentation to verify shares of stock, dividends, and other transactions, such as stock splits, related to stocks, and in some

cases, no value for the stocks themselves; lack of bank statements to verify bank and savings and loan balances; and lack of vouchers verifying tax payments. As was true with Bowles' failure to keep records of his gun transactions, he has not kept records of bank statements, stock statements, and other financial records which any competent fiduciary knows to keep. As was also true with Bowles' failure to keep records of his gun purchases, the court finds that the failure to keep these other records also was not due to any intent to profit or to harm the trust estate. Moreover, the court finds that the trust estate has not been harmed by Bowles' conduct in this regard.

The court has meticulously reviewed all of the accountings now filed by Bowles. As was noted earlier, when Bowles became trustee in 1969, the trust estate was valued at approximately $89,000. At the time of Mary Scott Southall's death in December 1997, and even after the annual payment of expenses and periodic disbursements to Mrs. Southall, it was valued at almost $450,000. In the absence of any evidence that Bowles' failure to keep proper records was part of a scheme by Bowles to profit from the trust or has otherwise caused harm to the trust, and in light of the absence of a specific challenge by either of the two present beneficiaries, the court will not impose any sanction on Bowles for his neglect.

### 4. *Hancock-Wirt-Caskie House Loan*

The 1985 accounting shows a loan to the Hancock-Wirt-Caskie House. The house is listed as a National Historic Landmark and was purchased by Bowles and a partner. Mary Scott Southall wanted the house restored and agreed to loan money from the trust to allow Bowles and his partner to do so. The money was loaned from the trust instead of given to Mrs. Southall and loaned by her, as allowed under the trust, on the advice of an accountant to lessen the tax consequence of the transaction. No deed of trust was drawn up. The loan has now been repaid with interest.

The court again agrees with the commissioner that Bowles' borrowing money from the trust estate was wrong. It was wrong even though the beneficiary agreed to it. No matter how enticing, trust money must not be used for the personal benefit of the trustee. Here, it was. The court again condemns such transactions in the strongest terms. Fortunately for all concerned, however, no harm came of the loan. It has been repaid with appropriate interest, and there is no need for the court to take any action. None will be taken.

### 5. *Southall Family Portrait*

The 1993 accounting shows a $965 payment for "restoration of portrait of Elizabeth Webster Southall, done on behalf of Mary S. Southall." Two more payments, totaling $2,620, are shown for restoration of one or more portraits of Mary Wells Webster, again "done on behalf of Mary S. Southall." In light of the will's provision giving Bowles complete discretion to distribute trust income and principal to Mrs. Southall, such expenditures are not inappropriate. What concerns the commissioner, and what again concerns the court, is the lack of documentation showing what work was done or that it was approved by Mrs. Southall. The court will once again accept Bowles' word that it was and will not take any action against him for his lack of records.

### 6. *Check to Southall Trust*

The final matter cited by the commissioner is an entry in the 1997 accounting showing a payment in the amount of $2,395.56 to "The Southall Trust, distribution on behalf of Mary S. Southall," the commissioner reporting that there was no explanation in any of the accountings of what the Southall Trust is. Bowles has now explained that the Southall Trust was established by Mary Scott Southall to reduce her taxable estate and to provide gifts of $10,000 each to six members of each of her daughter's families, twelve gifts in all. The trust was funded by notes secured by deeds of trust on property owned by Bowles' son. The face amount of the notes was $2,395.56 less than the $120,000 needed to fund the trust, so Bowles and Mrs. Southall agreed that Bowles would transfer that amount from the trust created by John Moseley Southall to this new trust. In light of the provision in the original trust allowing transfers to Mrs. Southall in the trustee's "sole discretion," and even though an explanation should have been given in the 1997 accounting, the court finds nothing improper about the transaction itself.

### Conclusion

Bowles' handling of the trust involved in this case is far from what the court expects of fiduciaries appointed by it and nominated by testators and others. If there were any hint that the trust lost money because of his actions, or if there were any formal challenge by either of the two present beneficiaries to his actions, the court would be hard-pressed not to award some type of monetary payment to the trust or to the beneficiaries. As has now been discussed in some detail, however, and with the exception of the relatively

small gain in the value of the gun collection, the trust seems to have done well under Bowles, and the beneficiaries will receive what their father wanted them to receive. Accordingly, the court will confirm the interim accounting for the period December 20, 1997, to October 20, 1998, and directs Bowles to make his final distribution and final accounting without further delay.